**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2016-16T1

NORTH JERSEY MEDIA GROUP INC.,

    Plaintiff-Appellant,

v.

PASSAIC COUNTY PROSECUTOR'S
OFFICE, and LISA VERLARDI in
her capacity as OPRA Liaison
for the Passaic County Prosecutor's
Office,

    Defendants-Respondents.

_____

Submitted January 30, 2018 — Decided August 17, 2018

Before Judges Yannotti and Leone.

On appeal from Superior Court of New Jersey,
Law Division, Passaic County, Docket No. L-
1135-16.

Pashman Stein Walder Hayden, PC, and North
Jersey Media Group Inc. n/k/a Fourth Edition
Inc., attorneys for appellant (Samuel J.
Samaro and Jennifer A. Borg, Of Counsel; CJ
Griffin, on the briefs).

William J. Pascrell, III, Passaic County
Counsel, attorney for respondents (Mary
Catherine Ryan, Chief Assistant Prosecutor,
and Robert J. Wisse, Assistant Prosecutor, Of
Counsel and on the brief).

PER CURIAM

Plaintiff North Jersey Media Group Inc., now known as Fourth Edition Inc., appeals from the trial court's September 2, 2016 order denying its request for counsel fees under the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, and from the December 2, 2016 final order. We affirm in part, reverse in part, and remand.

I.

On January 27, 2016, plaintiff made a request under OPRA and the common-law right of access to defendant Passaic County Prosecutor's Office (PCPO) and defendant Lisa Verlardi, its chief assistant prosecutor and OPRA liaison. The request sought records of a May 2014 shooting incident in Wayne. The request included "Incident reports, Operations reports, Investigation reports, and/or Offence reports, along with their supplemental reports" (Requested Reports), "Audio recordings of 9-1-1 calls" (9-1-1 Tape), and the information which must be released within twenty-four hours under N.J.S.A. 47:1A-3(b).

On January 29, 2016, the PCPO through Verlardi sent plaintiff a redacted indictment and the information under N.J.S.A. 47:1A-3(b). After obtaining an extension, the PCPO through Verlardi responses to the remaining requests on February 12, 2016. The

response stated that PCPO lacked documents or recordings responsive to some of the requests, and that the remainder of the requested documents were confidential or otherwise exempt from disclosure.

Regarding the Requested Reports, Verlardi's response stated they were "criminal investigatory records that are exempt from disclosure under N.J.S.A. 47:1A-1.1. Further, as this case involves a domestic violence incident the record(s) are confidential under the Prevention of Domestic Violence Act of 1991" (DV Act), N.J.S.A. 2C:25-17 to -35. The response referenced several provisions, including N.J.S.A. 2C:25-33.

Regarding the 9-1-1 Tape, Verlardi's response stated: "As this case involves a domestic violence incident the audio recording of the 911 call is confidential under the [DV Act]," citing several provisions. The response also stated "the Legislature intended to provide protection against disclosure of 911 tapes in those instances where a person had a reasonable expectation of privacy," citing case law and N.J.S.A. 47:1A-1. Finally, the response stated the 9-1-1 Tape "contains information relating to medical, psychiatric or psychological history, diagnosis, treatment and/or evaluation, which are not government records subject to public access pursuant to OPRA," citing Executive Order No. 26, ¶ 4(b)(1), 34 N.J.R. 3043 (Aug. 13, 2002).

3

On March 28, 2016, plaintiff filed a complaint in the Law Division. Plaintiff alleged that the 9-1-1 caller "claim[ed] someone had not taken his medication and was in need of medical assistance," that the suspect had grabbed his mother while holding a large knife and held her hostage, that after police negotiated with the suspect for ninety minutes an officer had fired a shot and accidentally hit the hostage, and that the suspect was found not guilty by reason of insanity. Plaintiff alleged defendants had violated OPRA and the common-law right of access by not releasing the requested documents and redacting any exempt information. Plaintiff demanded that defendants identify each responsive record, prepare a Vaughn index,[1] release the documents or submit them for in camera review and redaction, and that the court award counsel fees under N.J.S.A. 47:1A-6.

The trial court issued an order to show cause. Defendants answered the complaint and provided five certifications. Verlardi's certification stated that during her review of the Requested Reports, she located a one-page Supplementary Domestic Violence Offense Report (DVO Report). Verlardi "conceded" that

---

[1] A "Vaughn index" is a list of the records responsive to a request and of the exemptions claimed to warrant non-disclosure. N. Jersey Media Grp. v. Bergen Cty. Prosecutor's Office, 447 N.J. Super. 182, 191 (App. Div. 2016) (citing Vaughn v. Rosen, 484 F.2d 820, 826-27 (D.C. Cir. 1973)).

A-2016-16T1

the DVO Report was "required to be made pursuant to N.J.S.A. 2C:25-24(a) and is therefore not a criminal investigatory record," and "that I should have listed the [DVO Report] separately in my [February 12] response . . . clearly indicating it does not fall within a criminal investigatory record." She stated she did not violate OPRA because the DVO Report was properly withheld as confidential under the DV Act. Defendants later supplied Vaughn indexes detailing the requested records and the reasons for non-disclosure.

Meanwhile, the mother had sued numerous parties for her injuries in May 2014. The trial court asked defendants to alert her that records regarding the incident were the subject of OPRA litigation.

On June 29, 2016, the mother's lawyer wrote Passaic County stating he had discussed the OPRA request with the mother and her daughter. He reported the "family" joined plaintiff's OPRA request, and asked the trial court to order the release of all the records, including the 9-1-1 Tape.

The trial court held a show cause hearing. On September 2, 2016, the court denied plaintiff's request for a declaration that the non-disclosure of the Requested Reports and 9-1-1 Tape violated OPRA. The court also denied plaintiff's request for counsel fees under N.J.S.A. 47:1A-6. Nonetheless, the court granted

plaintiff's request for access to all requested documents under the common law, subject to redactions by the court. The court ordered defendants to provide the documents, with suggested redactions, for in camera review.

The prosecutor supplied the trial court with the documents, and provided an index of requested redactions. On September 14, 2016, the mother's counsel wrote the trial court stating he had reviewed the index, and had no objection to the disclosure of the documents, but had an objection to some of the redactions.

In a December 2, 2016 order, the trial court ruled that the documents could be released with defendants' proposed redactions. Defendants supplied to plaintiff the unredacted DVO Report, the unredacted 9-1-1 Tape, and the other unredacted and redacted documents. Plaintiff appeals the denial of counsel fees.

## II.

Plaintiff claims it was entitled to counsel fees because defendants violated OPRA by not disclosing the 9-1-1 Tape and the DVO Report. We must hew to our standard of review. "[D]eterminations about the applicability of OPRA and its exemptions are legal conclusions, and are therefore subject to de novo review." In re N.J. Firemen's Ass'n Obligation to Provide Relief Applications Under Open Pub. Records Act, 230 N.J. 258, 273-74 (2017) (citations omitted). "We also conduct plenary review

of the trial court's legal conclusion that a privilege exempts the requested records from disclosure, . . . as well as its determination . . . whether plaintiff is entitled to attorney's fees." K.L. v. Evesham Twp. Bd. of Educ., 423 N.J. Super. 337, 349 (App. Div. 2011) (citations omitted).

## III.

> OPRA succinctly sets forth the State's policy in favor of broad access to public records: (1) 'government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest,' N.J.S.A. 47:1A-1; (2) "any limitations on the right of access . . . shall be construed in favor of the public's right of access," ibid.; and (3) public agencies "shall have the burden of proving that the denial of access is authorized by law," N.J.S.A. 47:1A-6.
>
> [N. Jersey Media Grp. v. Twp. of Lyndhurst, 229 N.J. 541, 555 (2017).]

"OPRA broadly defines the term 'government record.'" Brennan v. Bergen Cty. Prosecutor's Office, 233 N.J. 330, 337 (2018). "Government record" includes any document or sound-recording "that has been made, maintained or kept on file in the course of . . . its official business by any . . . agency or authority of the State or of any political subdivision." N.J.S.A. 47:1A-1.1. "The custodian of a government record shall permit the record to be inspected, examined, and copied by any person . . . unless a

government record is exempt from public access by . . . any other statute; . . . Executive Order of the Governor; [or] Rules of Court[.]" N.J.S.A. 47:1A-5(a).

"A government record shall not include" a "criminal investigatory record[]," "which is deemed to be confidential for the purposes of [OPRA]." N.J.S.A. 47:1A-1.1. "'Criminal investigatory record' means a record which is not required by law to be made, maintained or kept on file that is held by a law enforcement agency which pertains to any criminal investigation or related civil enforcement proceeding." Ibid. Thus, "OPRA's criminal investigatory records exception does not apply to records that are 'required by law to be made, maintained or kept on file.'" Lyndhurst, 229 N.J. at 551 (quoting N.J.S.A. 47:1A-1.1); see id. at 565-66 (finding "Use Of Force" reports are required by law as they are required by the Attorney General's Use of Force Policy).[2]

## A.

We first address the 9-1-1 Tape. Defendants do not dispute that it is a government record but not a criminal investigatory record. We have found "that 911 calls are required by law to be recorded by a government agency and that these tapes must be

---

[2] No claim was made here that the documents "pertain to an investigation in progress by any public agency." N.J.S.A. 47:1A-3(a).

retained for 'no less than 31 days.'" <u>Serrano v. S. Brunswick</u>
<u>Twp.</u>, 358 N.J. Super. 352, 364 (App. Div. 2003) (quoting N.J.A.C.
17:24-2.4).[3] "From this, we conclude[d] that the subject 911 tape
comes within the definition of a government record for purposes
of N.J.S.A. 47:1A-1." <u>Ibid.</u> "Because the tape falls within the
definition of a 'government record' in N.J.S.A. 47:1A-1.1, and
because the law requires that such tapes be made and kept, it does
not qualify as a 'criminal investigatory record.'" <u>Id.</u> at 365;
see <u>N. Jersey Media Grp. v. Twp. of Lyndhurst</u>, 441 N.J. Super. 70,
107 & n.22 (App. Div. 2015), <u>aff'd in part & rev'd in part on</u>
<u>other grounds</u>, 229 N.J. 541 (2017).

However, we made clear in <u>Serrano</u> that 9-1-1 calls are not
necessarily discoverable under OPRA. We pointed out that OPRA
contained a privacy provision stating that "a public agency has a
responsibility and an obligation to safeguard from public access
a citizen's personal information with which it has been entrusted

---

[3] The Administrative Code's Chapter 17:24 "establishes the
technical requirements and operational standards for all
components of the Statewide 9-1-1 Enhanced Emergency Telephone
System." N.J.A.C. 17:24-1.1. The chapter requires that "[e]ach
9-1-1 line or each 9-1-1 terminal shall be connected to a logging
recorder that records" all voice communications in "all 9-1-1
calls." N.J.A.C. 17:24-2.1(f); see N.J.A.C. 17:24-1.1. N.J.A.C.
17:24-2.4 provides that each entity receiving a 9-1-1 call "shall
maintain the . . . [r]ecordings produced by the logging recorder
and all documents or records related to 9-1-1 calls in a secured
area for no less than 31 days[.]" N.J.A.C. 17:24-2.4(a), (a)(1);
see N.J.A.C. 17:24-1.1.

when disclosure thereof would violate the citizen's reasonable expectation of privacy." Id. at 368 (quoting N.J.S.A. 47:1A-1). We emphasized that "no privacy claim has been asserted" in Serrano; indeed, the 9-1-1 caller was represented by counsel in the OPRA proceedings and made no objection to disclosure of the content of the call to the news media. Id. at 368-69.

Nonetheless, we noted that in other cases privacy concerns might present "complex and challenging" issues that "might entail a consideration and balancing of the interests, not only of those who call 911 or who utilize other police or emergency communications services, but of others who are mentioned in or affected by the calls." Id. at 369. "We emphasize[d] that our disposition is based on the particular circumstances with which we are confronted, including the characteristics of the 911 call involved in this case, and in particular the caller's express lack of objection to the disclosure." Id. at 362. We did "not predict what disposition may be appropriate in other cases involving 911 tapes." Ibid.

The concurring opinion in Serrano similarly stressed that because of the absence of a privacy objection "this case does not provide the opportunity for a definitive ruling on the question of whether 911 tapes are public records under OPRA," and that "the court is not concluding that all 911 tapes are open to the public

under OPRA." Id. at 371 (Coburn, J., concurring). Judge Coburn pointed out that New Jersey's privacy provision was "patterned after" and "almost identical to the provision in Kentucky," and that a Kentucky court had held that provision exempted 911 calls because "[r]eleasing the tapes of 911 calls seeking police assistance, particularly in instances of domestic violence, would have a chilling effect on those who might otherwise seek assistance because they would become subject to . . . retaliation, harassment, or public ridicule." Id. at 371-72 (quoting Bowling v. Brandenburg, 37 S.W.3d 785, 788 (Ky. Ct. App. 2000)). Judge Coburn concluded that 9-1-1 calls should be confidential and not disclosed unless either the caller consents or "disclosure would not 'violate the citizen's reasonable expectation of privacy.'" Id. at 373 (quoting N.J.S.A. 47:1A-1).

Based on the majority and concurring opinions in Serrano, the Law Division denied access to a 9-1-1 tape under OPRA in Asbury Park Press v. Ocean Cty. Prosecutor's Office, 374 N.J. Super. 312, 316-18 (Law Div. 2004). After a thorough review of OPRA's legislative history, the court ruled "that the Legislature intended to provide protection against disclosure in those instances in which a person had a reasonable expectation of privacy." Id. at 326-29, 331.

Our Supreme Court has cited the discussion in <u>Serrano</u> and <u>Asbury Park Press</u> about the protection of 9-1-1 calls by OPRA's privacy provision, and has concluded it "imposes an obligation on public agencies to protect against disclosure of personal information which would run contrary to reasonable privacy interests." <u>Burnett v. Cty. of Bergen</u>, 198 N.J. 408, 423-24 (2009). The Court found OPRA required balancing "ready access to government documents while safeguarding the citizen's reasonable expectation of privacy." <u>Id.</u> at 425-26. The Court endorsed "a balancing test that weighs both the public's strong interest in disclosure with the need to safeguard from public access personal information that would violate a reasonable expectation of privacy." <u>Id.</u> at 427. The factors to be considered are:

> (1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognized public interest militating toward access.
>
> [<u>Ibid.</u> (quoting <u>Doe v. Poritz</u>, 142 N.J. 1, 88 (1995).]

The <u>Burnett</u> "balancing exercise requires a case-specific analysis, and appellate review of the trial court's application

of the factors is de novo." <u>Paff v. Ocean Cty. Prosecutor's Office</u>, 446 N.J. Super. 163, 193 (App. Div.) (citation omitted), <u>rev'd on other grounds</u>, ___ N.J. ___ (2018).

In denying plaintiff's request for the 9-1-1 Tape, defendants argued OPRA provided protection against disclosure of 9-1-1 tapes where a person has a reasonable expectation of privacy, citing OPRA's privacy provision and <u>Asbury Park Press</u>. Defendants also pointed out that the call involved a domestic violence incident and contained information relating to medical, psychiatric, or psychological history, diagnosis, or treatment.

Review of the now-revealed 9-1-1 Tape shows that the sister reported she needed an ambulance and a police officer because her brother has a psychiatric disorder, had not been taking his medication, needed medical attention, sounded aggressive, and was alone in the house with their mother. Particularly as the 9-1-1 call was soon followed by the brother wielding a knife, grabbing the mother, and holding her hostage, disclosure would reveal that the brother had mental health and medical issues, that the sister had been the one calling the police, and that incipient crime was between brother and mother and thus was domestic violence.

These were legitimate privacy concerns. Defendants had to consider "what the impact would be on [the victim,] the victim's family and loved ones" if the recording was released to the news

media.  <u>Asbury Park Press</u>, 374 N.J. Super. at 330.  "[I]s it necessary for families to have their most tragic and personal moments broadcast for all to hear?  Does a personal tragedy become a public spectacle simply because a person phones the police for aid?"  <u>Id.</u> at 320 (quoting <u>Cincinnati Enquirer v. Hamilton Cty.</u>, 662 N.E.2d 334, 339 (Ohio 1996) (Pfeifer, J., concurring)); <u>accord</u> <u>Serrano</u>, 358 N.J. Super. at 372-73 (Coburn, J., concurring).

Unredacted disclosure of the 9-1-1 Tape would raise such privacy concerns not only for this family but among future potential 9-1-1 callers.  The release of 9-1-1 information could "create a chilling effect" among potential 9-1-1 callers "for fear that the information may be subject to public scrutiny," and could "discourage citizens" from calling 9-1-1.  <u>See</u> <u>N.J. Firemen's Ass'n</u>, 230 N.J. at 280, 282 (denying disclosure of relief payments under the <u>Burnett</u> privacy test).

Moreover, there was "'an express statutory mandate, articulated public policy, or other recognized public interest militating [<u>against</u>] access.'"  <u>Burnett</u>, 198 N.J. at 427 (citation omitted); <u>see</u> <u>id.</u> at 435-37.  The DV Act provides that "[a]ll records maintained pursuant to this act shall be confidential and shall not be made available to any individual or institution except as otherwise provided by law and rule."  N.J.S.A. 2C:25-33(a); <u>see</u> <u>R.</u> 1:38-3(d)(9). Other provisions protect the names and addresses

14

of victims of domestic violence. E.g., N.J.S.A. 2C:25-25(c); N.J.S.A. 47:4-4; R. 1:38-3(c)(12), (d)(10). Even though the 9-1-1 Tape was maintained pursuant to a different act, these provisions articulated the public policy militating against disclosure of information concerning domestic violence and its victims.

In addition, the 9-1-1 Tape contained "[i]nformation relating to medical, psychiatric or psychological history, diagnosis, treatment and/or evaluation." Exec. Order No. 26, ¶ 4(b)(1), 34 N.J.R. 3043(b) (Aug. 13, 2002). Such records "shall not be considered to be government records subject to public access pursuant to [OPRA]." Id. at ¶ 4. Thus, an "Executive Order of the Governor" exempted at least that information from disclosure under OPRA. N.J.S.A. 47:1A-1; see N.J.S.A. 47:1a-9(a); Michelson v. Wyatt, 379 N.J. Super. 611, 619-20, 622, 624 (App. Div. 2005) (citing this executive order to bar access to medical information).

Nevertheless, those privacy concerns could have been addressed by redacting the name of the caller (no other persons were named), the address of the victim, references to the brother's psychiatric disorder, and the familial relationships that revealed this was a domestic violence situation and would aid in identifying the caller. The redactions could have been performed by redacting the tape or, if that was unreasonable, by preparing a redacted transcript of the tape, which was less than two minutes long. See

<u>Paff v. Ocean Cty. Prosecutor's Office</u>, ___ N.J. ___, ___ (2018) (slip op. at 34) (noting "a third party's reasonable expectation of privacy may warrant withholding a record from disclosure under N.J.S.A. 47:1A-1," but "redaction prior to disclosure . . . may resolve a privacy concern").

OPRA provides in N.J.S.A. 47:1A-5(g):

> If the custodian of a government record asserts that part of a particular record is exempt from public access pursuant to P.L.1963, c.73 (C.47:1A-1 et seq.) as amended and supplemented, the custodian shall delete or excise from a copy of the record that portion which the custodian asserts is exempt from access and shall promptly permit access to the remainder of the record.

Although the statutory reference is to the former Right to Know Law, <u>L.</u> 1963, <u>c.</u> 73, both we and our Supreme Court have cited N.J.S.A. 47:1A-5(g) as authorizing redaction of any exempt material. <u>Paff v. Galloway Twp.</u>, 229 N.J. 340, 358 (2017) ("OPRA also permits redaction of parts of government records that are not subject to disclosure."); <u>Commc'ns Workers of Am. v. Rousseau</u>, 417 N.J. Super. 341, 368 (App. Div. 2010). Indeed, defendants redacted the indictment to remove items exempted under the DV Act.

In withholding the entire 9-1-1 Tape, defendants cited <u>Asbury Park Press</u>. Plaintiff argues the 9-1-1 Tape is a far cry from the "chilling [and] wrenching" 9-1-1 call in <u>Asbury Park Press</u>, containing the last words of a man after he and a woman had been

fatally shot by her son. 374 N.J. Super. at 314-15, 330. We have listened to the 9-1-1 Tape and agree it lacks such emotional content. The 9-1-1 call was calmly made by the sister before she arrived on the scene, and before any acts of domestic violence were known to have occurred. Revelation of a redacted 9-1-1 Tape or transcript would not have posed the same risk of inflicting emotional anguish. See Asbury Park Press, 374 N.J. Super. at 331 (finding that, even if redacted, disclosure of the 9-1-1 call "would intrude on the reasonable expectation of privacy").

Weighing the Burnett factors convinces us that the privacy concerns at the time of defendant's decision justified release of a redacted 9-1-1 Tape, but not the release of the entire tape as requested by plaintiff, or defendants' refusal to release any of the tape. (1) The type of record requested, a 9-1-1 tape, primarily records the caller's statement but can reflect on government actions during and after the call. (2) The 9-1-1 contained some private and exempt information, but also other relevant information. (3) Release of the private and exempt information to the news media had the potential to cause harm. (4) Disclosure of the private and exempt information could injure the relationship between this caller and future 9-1-1 callers and the police. (5) No safeguards against unauthorized disclosure were offered or obvious once the private and exempt information

was revealed to the news media. (6) The degree of need for access was not so strong to override the need to protect the private and exempt information. (7) There was an express statutory mandate and an articulated public policy militating against the release of the private and exempt information.

The need for access requires further comment. Burnett states:

> when legitimate privacy concerns exist that require a balancing of interests and consideration of the need for access, it is appropriate to ask whether unredacted disclosure will further the core purposes of OPRA: "to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process."
>
> [198 N.J. at 435 (quoting Mason v. City of Hoboken, 196 N.J. 51, 64 (2008) (quoting Asbury Park Press, 374 N.J. Super. at 329)).]

Although plaintiff's OPRA request gave no reason for seeking the twenty-month-old 9-1-1 Tape, the PCPO undoubtedly knew its prosecutors were conducting the brother's ongoing trial when plaintiff's request was made. Moreover, our Supreme Court has recently instructed that "the need for transparency, which OPRA is designed to foster, . . . weighs heavily, particularly when law enforcement uses its most awesome authority — deadly force." Lyndhurst, 229 N.J. at 574.

On the other hand, the 9-1-1 Tape has little bearing on the officer's use of deadly force, and no relevance to the alleged

delay in disclosing who was shot. The 9-1-1 call was made before any acts of domestic violence were known. Moreover, the officer's decision to shoot came after more than an hour of negotiating with the brother and observing his actions in the armed hostage-taking. By contrast, <u>Lyndhurst</u> involved disclosure of "Use of Force" reports, which must be completed whenever an officer uses deadly force. <u>Id.</u> at 553, 565. Such forms are directly relevant to the use of deadly force. Thus, the "need for access" to the 9-1-1 Tape was limited and justified disclosure only of a redacted version. <u>See</u> <u>Burnett</u>, 198 N.J. at 434-35.

Plaintiff argues the 9-1-1 Tape should have been released because its details were already known. Plaintiff cites its two May 2014 news articles and a police email to the press stating there was "a 9-1-1 call seeking medical assistance" and "an ambulance." Those documents also named the mother and gave her address, said she was the mother of the brother and named him, and described the domestic violence witnessed by the officers and the alleged shooting of the brother. However, those documents did not identify the 9-1-1 caller as the sister, or mention that the brother had a psychiatric disorder or was off his medications.

Plaintiff also cites the opinion in the brother's bench trial and another news article, both issued on February 3, 2016, after plaintiff's OPRA request but before defendants' response. Those

documents: identified the mother, brother, sister, and their relationship; described the brother's psychiatric disorder in detail and said he was off his medications, resulting in the 9-1-1 call; and described the domestic violence witnessed by the officers and the officer shooting the mother. The bench opinion also gave the mother's address and identified the sister as the 9-1-1 caller. The article added that family members repeatedly told police he was mentally ill.

Those documents do not change our conclusion. First, there is no evidence defendants were aware of the news articles when making the decision. Plaintiff did not provide them to support its request. Moreover, custodians should not be required to search the media to determine whether private or exempt information in government documents has been revealed.

The custodian normally has only seven days in which to locate, review, and decide whether to release records under OPRA. N.J.S.A. 47:1A-5(i). The difficulties faced by a custodian in deciding in a few days whether documents are government records or fall within an exemption are already compounded when the custodian must apply a balancing test, such as determining whether disclosure "would violate the citizen's reasonable expectation of privacy" under N.J.S.A. 47:1A-1 and <u>Burnett</u>. We would greatly increase those

difficulties if we require custodians to gather and consider external information not presented to them.

Second, the custodian's obligations under OPRA are not lifted by such revelation. OPRA places on the custodian "a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy." N.J.S.A. 47:1A-1. OPRA also precludes the custodian from releasing "a government record [that] is exempt from public access," and requires the custodian "to delete or excise from a copy of the record that portion which the custodian asserts is exempt from access." N.J.S.A. 47:1A-5(a), (g). Nothing in OPRA, the DV Act, or the executive order lifts those obligations if the information has otherwise become public. Nor had any of the persons thus protected explicitly waived that protection when defendants responded to plaintiff's OPRA request.

Third, while revelation of the information by the news media or in court proceedings may reduce the potential harm, it also reduces the need for access. Thus, it does not necessarily change the balancing of the Burnett factors. We do not preclude the consideration of such revelation by a custodian or court performing the Burnett balancing, or the balancing under the common-law right of access. However, we will not overturn a custodian's Burnett

balancing if the news articles were not brought to the custodian's attention, and the protected parties had not agreed to revelation.

Plaintiff faults defendants for not contacting the family members to ascertain their view about disclosure. However, nothing in OPRA requires custodians during their brief period of review to make such inquiries before enforcing OPRA's provisions. If plaintiff wished to support its OPRA request with the consent of the protected persons, plaintiff could have contacted them itself, as it was aware of the identity of the family members from its earlier news articles and from covering the ongoing trial.

Plaintiff argues the trial "court must have agreed that releasing the 911 call would not have violated anyone's reasonable expectation of privacy because it granted access to the full 911 call." However, the court only granted access after the lawyer for the mother discussed the matter with her and the sister and reported they joined the request to release the records.

The trial court found defendants "had a good faith basis to" deny disclosure the 9-1-1 Tape because "there was no waiver yet. Now that there's a waiver, [plaintiff] get[s] it." The court explained that because "now they have a waiver which they didn't have at the time of your request from [the sister] and her mother," it would "provide that [9-1-1 Tape] under the common law." The court found "that there wasn't an OPRA violation because there

were privileges asserted that . . . were waived subsequent to the denial."

We agree that a custodian's proper decision to deny an OPRA request does not become an OPRA violation because protected persons join in the request for disclosure more than four months after the custodian's decision. OPRA provides that "[a] person who is denied access to a government record by the custodian of the record . . . may[] institute a proceeding to challenge the custodian's decision by filing an action in Superior Court." N.J.S.A. 47:1A-6. Thus, the proceeding challenges the "custodian's decision" to deny access, and the proceeding challenging that decision must be adjudicated based on the facts known to the custodian at the time, not based on subsequent developments. As the trial court stated, the consent of the mother and sister was "after the denial" and thus "after the fact," and properly refused to find an OPRA violation based on "hindsight."

Such consent by the protected parties can be considered thereafter. A new OPRA request based on the consent can be filed. A court adjudicating the proceeding challenging the earlier decision can take the consent into account under the common law, as here. A court that has found an OPRA violation can take the consent into account in shaping its remedy. See Serrano, 358 N.J.

Super. at 368-69. But such developments cannot turn a custodian's proper OPRA decision into an OPRA violation after the fact.

In sum, we agree with the trial court that defendants could properly refuse to reveal the private and exempt information in the 9-1-1 Tape, and thus did not have to disclose the entire tape. However, we find defendants erred by not providing a redacted version of the tape as required by N.J.S.A. 47:1A-5(g). To that extent only, defendants violated OPRA.

B.

Similar privacy concerns arise concerning the DVO Report. However, we need not analyze whether the DVO Report was protected under OPRA's privacy provision because it was made confidential and exempted from disclosure by the DV Act, and thus by OPRA.

The DVO Report is "required by law to be made, maintained or kept on file," and thus is not a "[c]riminal investigatory record." N.J.S.A. 47:1A-1.1. The DV Act provides in N.J.S.A. 2C:25-24(a):

> It shall be the duty of a law enforcement officer who responds to a domestic violence call to complete a domestic violence offense report. All information contained in the domestic violence offense report shall be forwarded to the appropriate county bureau of identification and to the State bureau of records and identification in the Division of State Police in the Department of Law and Public Safety. A copy of the domestic violence offense report shall be forwarded to the municipal court where the offense was

> committed unless the case has been transferred
> to the Superior Court.

The State Police with the Department of Law and Public Safety must "compile and report annually to the Governor, the Legislature and the Advisory Council on Domestic Violence on the tabulated data from the domestic violence offense reports[.]" N.J.S.A. 2C:25-24(c).

Because the DV Act requires the making and maintaining of the DVO Report, it is covered by the confidentiality provision of the DV Act of 1991: "All records maintained pursuant to this act shall be confidential and shall not be made available to any individual or institution except as otherwise provided by law." N.J.S.A. 2C:25-33(a). The Rules of Court since at least 2009 have similarly required the courts to "exclude[] from public access" all "[d]omestic violence records and reports pursuant to N.J.S.A. 2C:25-33." R. 1:38-3(d), (d)(9).

In enacting OPRA in 2002, the Legislature explicitly preserved and incorporated such provisions exempting confidential records from public access. "The provisions of this act shall not abrogate any exemption of a public record or government record from public access heretofore made pursuant to . . . any other

statute." N.J.S.A. 47:1A-9(a).[4] OPRA states "all government records shall be subject to public access unless exempt from such access by . . . any other statute . . . [or] Rules of Court." N.J.S.A. 47:1A-1.

Thus, "N.J.S.A. 47:1A-1 explicitly recognizes that records may be exempt from public access based upon authorities other than the exemptions enumerated within OPRA." <u>Bergen Cty. Prosecutor's Office</u>, 447 N.J. Super. at 202. For example, our Supreme Court recently noted "OPRA also exempts from disclosure any information that is protected by any other state or federal statute, regulation, or executive order. As a result, the home address of a victim of domestic violence cannot be obtained through OPRA." <u>Brennan</u>, 233 N.J. at 338 (citing N.J.S.A. 47:1A-9(a) and N.J.S.A. 47:4-2 to -4).

Plaintiff argues N.J.S.A. 2C:25-33(a) does not provide an absolute privilege. However, its language is absolute - "All records maintained pursuant to this act shall be confidential and shall not be made available to any individual or institution except as otherwise provided by law," <u>ibid.</u> - unless another law provides

---

[4] Moreover, N.J.S.A. 47:1A-9(b) provides that OPRA "shall not abrogate or erode any . . . grant of confidentiality heretofore established or recognized by . . . statute, . . . , which privilege or grant of confidentiality may duly be claimed to restrict public access to a public record or government record."

otherwise. OPRA does not provide otherwise, because "N.J.S.A. 47:1A-9 codifies the Legislature's unambiguous intent that OPRA not abrogate or erode existing exemptions to public access." Bergen Cty. Prosecutor's Office, 447 N.J. Super. at 202.

Plaintiff relies on a Chancery Division decision, Pepe v. Pepe, 258 N.J. Super. 157 (Ch. Div. 1992). There, the judge faced a constitutional challenge to the sealing of court records, relied on cases about the public's right to attend court proceedings, and found "that the confidentiality provision under N.J.S.A. 2C:25-33 is not absolute and that under certain circumstances the court may permit access to that which has been designated confidential by statute." Id. at 163-64. However, no constitutional challenge was raised here. Nor does this case involve a request to access court records, let alone attend court proceedings. Under the circumstances, we will not address a constitutional issue, or consider the validity of Pepe.

Plaintiff argues the Legislature has acquiesced in Pepe because it did not amend the DV Act to overrule Pepe. However, "[l]egislative inaction is a thin reed generally on which to base an interpretive argument." State v. Hudson, 209 N.J. 513, 536 (2012). It is a particularly untenable argument here, because Pepe is a trial court opinion that may never have come to the Legislature's attention, and which was non-binding on any court.

See <u>State v. Haliski</u>, 140 N.J. 1, 15-16 (1995) (noting legislative inaction is unreliable as it may be attributable to the Legislature's "'unawareness'" or "'indifference'" to a judicial decision).

In any event, <u>Pepe</u>'s three factors for consideration included whether "the release of the court documents be detrimental or potentially harmful to the victim." <u>Id.</u> at 165. Disclosure and publication of the DV Form would have been potentially harmful by drawing attention to the details of the domestic violence. Moreover, the only published decision to consider <u>Pepe</u>'s test "add[ed] one additional factor that ought to be considered in its analysis: whether this court's decision will deter others similarly situated from filing actions under the Act for fear of possible disclosure of their records in the future." <u>Taub v. Cullen</u>, 373 N.J. Super. 435, 439 (Ch. Div. 2004). Allowing disclosure of the news media of the DVO Reports prepared in every domestic violence case could discourage victims from coming forward, as attested to in on of the certifications defendants presented to the trial court. <u>See</u> <u>id.</u> at 440; <u>see also</u> <u>Pepe</u>, 258 N.J. Super. at 162. This was not "one of those rare exceptions where the public interest and the press's right to know outweigh

28

the general expectation of privacy accorded to victims of domestic violence."  Taub, 373 N.J. Super. at 441.[5]

Thus, defendants properly enforced the DV Act's prohibition of the disclosure of the confidential DVO Report by denying plaintiff's OPRA request.  Indeed, Pepe only released court records after the parties named in the DVO "advised the court that they have no objection to the [media]'s application."  258 N.J. Super. at 165.  Here, it was not until four months later that the mother and sister indicated they had no objection to release of the record, and the trial court similarly relied on their consent in its decision to disclose the DVO Report under the common law.  As set forth above, that subsequent development did not convert a proper decision into an OPRA violation ex post facto.

Therefore, the custodian's decision not to disclose the DVO Report was not a violation of OPRA.  Redaction was not required under N.J.S.A. 47:1A-5(g) because "that section of the statute cannot apply" where "the entire document is privileged and exempt." Libertarians for Transparent Gov't v. Gov't Records Council, 453 N.J. Super. 83, 93 (App. Div.), certif. denied, __ N.J. __ (2018).

IV.

---

[5] The judge found Taub was such a rare case because the defendant was a "serial killer," and "[t]he front page of the newspaper on a regular basis contains stories of" his crimes.  Id. at 440-42. No such pervasive coverage was shown here.

Defendant ultimately challenges the trial court's denial of counsel fees. OPRA provides in N.J.S.A. 47:1A-6:

> A person who is denied access to a government record by the custodian of the record . . . may[] institute a proceeding to challenge the custodian's decision by filing an action in Superior Court . . . . If it is determined that access has been improperly denied, the court or agency head shall order that access be allowed. A requestor who prevails in any proceeding shall be entitled to a reasonable attorney's fee.

A requestor prevails in an OPRA proceeding

> (1) [when] records are disclosed "after the entry of some form of court order or enforceable settlement" granting access, or (2) "when a government agency voluntarily discloses records after a lawsuit is filed" and under the catalyst theory the plaintiff "can establish a 'causal nexus' between the litigation and the production of requested records" and "'that the relief ultimately secured by plaintiffs had a basis in law.'"
>
> [Stop & Shop Supermarket Co. v. Cty. of Bergen, 450 N.J. Super. 286, 292 (App. Div. 2017) (quoting Mason, 196 N.J. at 57, 76-77, 79).]

Both the 9-1-1 Tape and the DVO Report were disclosed in the trial court's September 2, 2016 order, but under the common-law right of access rather than OPRA. Plaintiff contends that the court erred in relying on the common law in granting disclosure. However, in our de novo review, we have found that defendants' decisions not to disclose the DVO Tape or the unredacted 9-1-1

Tape were proper under OPRA, and that defendants violated OPRA only by not providing a redacted version of the 9-1-1 Tape. Therefore, defendant is entitled to counsel fees under OPRA only to the extent they are attributable to that OPRA violation. We remand to the trial court to determine the reasonable counsel fees attributable to that violation.

Plaintiff does not argue that obtaining a judgment under the common law entitled it to counsel fees under OPRA. Rather, plaintiff argues its OPRA lawsuit was the catalyst for its receipt of the DVO Report and the unredacted 9-1-1 Tape. However, plaintiff failed to show defendants violated OPRA by not providing those documents in its response to plaintiff's OPRA request. Moreover, the trial court released those documents under the common law only because, more than four months later, the mother and sister waived their privacy interests in those documents. Thus, as to those documents, plaintiff failed to show that its OPRA lawsuit had "some basis in law" when it was filed, or that their OPRA lawsuit "was causally related to securing the relief obtained." Mason, 196 N.J. at 57.

To rule plaintiff was entitled to fees under OPRA for those documents would reward plaintiff for filing an OPRA lawsuit the court properly found lacked merit, and penalize defendants for making a correct decision under OPRA to withhold those documents.

As to those documents, plaintiff "is not entitled to attorney's fees because its OPRA request was improper and the [PCPO's] response was reasonable" and correct. Spectraserv, Inc. v. Middlesex Cty. Utils. Auth., 416 N.J. Super. 565, 583 (App. Div. 2010). Moreover, there was no "causal connection" because the trial court ordered those documents produced under the common law after the mother and sister "withdrew [any] objection" to the production of documents "deemed privileged and confidential." See id. at 584 (finding no causal connection where the custodian produced confidential documents after a licensor withdrew its objection).

"A requestor . . . is not a prevailing party simply because the agency produced documents after an OPRA suit was filed." Id. at 583. "Our Supreme Court in Mason refused to presume OPRA litigants are entitled to counsel fees even when records are produced after suit is filed." Stop & Shop, 450 N.J. Super. at 292 (citing Mason, 196 N.J. at 78-79). "A plaintiff is considered a prevailing party 'when actual relief on the merits of [the OPRA] claim materially alters the relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'" Teeters v. Div. of Youth & Family Servs., 387 N.J. Super. 423, 432 (App. Div. 2006) (citation omitted). Plaintiff failed to show that here.

Plaintiff cites comments in the trial court's oral opinion which allegedly represented a misunderstanding of OPRA and its counsel fee provision. As we have reviewed the OPRA issue de novo, such alleged misunderstandings are irrelevant to our decision. We comment briefly to avoid any confusion on remand.

OPRA's fee-shifting provision serves "[t]o ensure that the average citizen is not deterred from challenging an agency's decision due to the financial risk involved." N.J. Firemen's Ass'n, 230 N.J. at 276. Nonetheless, any requestor who prevails is entitled to counsel fees, including media companies. See, e.g., Courier News v. Hunterdon Cty. Prosecutor's Office, 378 N.J. Super. 539, 540, 548 (App. Div. 2005). Where a requestor prevails in obtaining a document withheld in violation of OPRA, the award of fees is "mandatory," with the amount "subject to a rule of reasonableness with no expressed monetary limitation." Teeters, 387 N.J. Super. at 433; see Mason, 196 N.J. at 75.

If the requestor prevails in an OPRA proceeding, the requestor is entitled to counsel fees even if the custodian acted in good faith, did not willfully violate OPRA, applied a reasonable if erroneous interpretation of the statute, or faced conflicting judicial decisions. See, e.g., Am. Civil Liberties Union of N.J. v. N.J. Div. of Criminal Justice, 435 N.J. Super. 533, 536 (App. Div. 2014); Smith v. Hudson Cty. Register, 422 N.J. Super. 387,

397-98 (App. Div. 2011). Custodians must apply OPRA, its exemptions, and its balancing test to the best of their ability. If the custodian correctly applies the exemption or balancing test, there is no OPRA violation and counsel fees are inappropriate. If the custodian incorrectly applies the exemption or balancing test, there is an OPRA violation and counsel fees are appropriate.

The trial court recognized this standard, but noted its harshness for custodians. The court expressed concern that the balancing test is too analytical for custodians, but that concern is lessened here where the custodian was the chief assistant prosecutor. The court was also concerned public agencies might open themselves to suit if they released information that was potentially private under N.J.S.A. 47:1A-1 without the consent of the persons whose privacy was being protected. We understand those concerns, but under current law courts must review de novo the decisions of custodians, even where they applied a balancing test.[6]

---

[6] It has not been argued here that courts should review custodians' application of a balancing test under a deferential standard, such as the standard we apply to review decisions of the Government Record Council, created by OPRA as an alternate body in which to challenge a custodian's actions. N.J.S.A. 47:1A-7. In reviewing the Council's decisions, we "accord deference to final agency actions, reversing those actions if they are 'arbitrary,

Affirmed in part, reversed in part, and remanded to determine the reasonable counsel fees attributable to the failure to provide a redacted version of the 9-1-1 Tape.[7]  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

capricious or unreasonable or [if the action] is not supported by substantial credible evidence in the record as a whole.'"  E.g., McGee v. Twp. of E. Amwell, 416 N.J. Super. 602, 612 (App. Div. 2010) (quoting N.J. Soc'y for the Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 384-85 (2008) (alteration in original) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)); Bart v. City of Paterson Hous. Auth., 403 N.J. Super. 609, 618 (App. Div. 2008).

[7] The counsel fees should be assessed against PCPO, not Verlardi. Courier News, 378 N.J. Super. at 541.  "Individuals, such as public officials, officers, employees or custodians, are only personally liable if they 'knowingly and willfully' violate the provisions of OPRA, and are 'found to have unreasonably denied access [to the government records] under the totality of the circumstances.'" Id. at 546 (quoting N.J.S.A. 47:1A-11(a)).  That has not been claimed or shown here.

A-2016-16T1