7 A.3d 231 (2010)
416 N.J. Super. 565
SPECTRASERV, INC., Plaintiff-Appellant,
v.
MIDDLESEX COUNTY UTILITIES AUTHORITY and Richard Fitament, Defendants-Respondents.
No. A-1080-09T2.
Superior Court of New Jersey, Appellate Division.
Argued October 19, 2010.
Decided November 18, 2010.
*232 Dara Aquila Govan argued the cause for appellant (Riker Danzig Scherer Hyland & Perretti, LLP, attorneys; Marc D'Angiolillo, of counsel; Ms. Govan and Jonathan M. Sandler, Morristown, on the brief).
*233 Brian J. Molloy argued the cause for respondents (Wilentz, Goldman & Spitzer, P.A., attorneys; Mr. Molloy, Frederick Dennehy, Donald E. Taylor, William J. Linton, of counsel and on the brief; Keith L. Hovey and Daniel J. Kluska, Woodbridge, on the brief).
Before Judges SKILLMAN, PARRILLO and YANNOTTI.
The opinion of the court was delivered by
PARRILLO, J.A.D.
Plaintiff Spectraserv, Inc. (Spectraserv) appeals from an order of the Law Division denying its request for attorney's fees of $121,520 as the claimed "prevailing party" in litigation it instituted against defendant Middlesex County Utilities Authority (MCUA) under New Jersey's Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13. For the reasons that follow, we affirm.
The MCUA is a governmental entity responsible for, among other things, wastewater management in Middlesex County and portions of Union and Somerset counties. It services about 750,000 residents and businesses in central New Jersey.
Sometime ago, the MCUA evaluated potential process modifications to its main wastewater treatment plant in Sayreville to reduce the amount of sludge product and minimize transportation, thereby cutting costs. The modification ultimately chosen was based on a patented process known as "biopHast duopHase," which creates a sludge product substantially reduced in volume and water. R3 Management, Ltd. (R3 Management), an engineering firm based in the United Kingdom, held the patent for this technology in the United States and Europe.
On June 21, 2001, the MCUA entered into a licensing and confidentiality agreement with R3 Management wherein the MCUA was granted "a nontransferable, nonexclusive, and irrevocable license" to implement this technology at its wastewater treatment plant. The agreement also obligated the MCUA "to treat as secret and confidential the R3 Management Technology which is disclosed to [the MCUA] by [R3 Management]," and "not at any time to disclose or permit or allow to be disclosed the R3 Management Technology or any part thereof to any third party, except any necessary disclosure to clients and sub-contractors of [the MCUA] or as required by law or court, governmental or administrative order or directive."[1]
On March 17, 2003, Spectraserv, a New Jersey-based general contractor with experience in the construction and rehabilitation of sewerage and wastewater treatment facilities, bid on the MCUA project. As the lowest bidder, Spectraserv was awarded and signed an engineering contract with the MCUA on May 16, 2003. This contract required the design of an integrated system of equipment and controls that, upon completion, would transfer and process sewage sludge from the MCUA's existing conveyor and dewatering equipment through the patented biopHast duopHase process, drying the sludge with heat and mixing it with an alkaline based-additive. At the end of the process, the treated sludge would be appropriate for use and disposal under applicable government regulations.
Disputes between the parties arose thereafter. The contract between the *234 MCUA and Spectraserv contained milestones that were to be met by May 31, 2005, but when Spectraserv allegedly fell behind schedule, the parties agreed to a change order on March 24, 2005 that settled delays and liquidated damage claims through the end of February 2005. The parties also agreed to extend the last milestone completion date to December 14, 2005, which, according to the MCUA, Spectraserv also failed to meet. Eventually, the MCUA terminated its contract with Spectraserv for default, claiming unexcused completion delays and failure to meet contract specifications. On March 2, 2007, Spectraserv filed a lawsuit against the MCUA in the Law Division, asserting various claims arising under the parties' engineering contract (the construction litigation).
Beginning in October 2005, two months shy of the contract's completion deadline, Spectraserv made several OPRA requests of the MCUA, the last of which is the subject of this appeal. Its initial request on October 7, 2005 sought to inspect any and all documents, contracts, resolutions, and copies of payments relating to R3M Engineering and its president, Michael J. Samuel, for the period from January 2003 to present. On October 18, 2005, the MCUA made the requested documents available for inspection.
A second OPRA request on January 11, 2007, more than one year after the December 31, 2005 contract completion date had passed, sought the MCUA's "entire project file" on the construction and improvements of the agency's wastewater treatment plant in Sayreville, which was designed in the 1950s. Counsel for the MCUA timely responded that the request "encompasses hundreds of thousands of documents and records that have been generated over a period of 50 years or more." Since the request was not "limited in either time or scope" and "contain[ed] broad and expansive language such as `in connection with,' `referring or relating to,' and `or other services,'" the MCUA could not project when it could produce the records. Accordingly, the MCUA inquired of Spectraserv whether "a more tailored and complete request" could be submitted and advised that it would await Spectraserv's answer before deciding whether to proceed with the original request.
Less than one month after this inquiry, on February 22, 2007, Spectraserv submitted its final OPRA request, which the MCUA received via counsel on February 26, 2007. Apparently intended to supplement its earlier request, this latest version included a government records request form and a four-page attachment, consisting of sixteen separate requests in paragraph form, some with multiple subparts. Among other things, this request sought, once again, the "entire project file" pertaining to the contract between Spectraserv and the MCUA, as well as "[a]ny and all contracts performed with or for the benefit of the MCUA" or thirteen other named individuals and entities since January 1998. In addition, Spectraserv sought the complete engineering design of the project's improvements, the engineer's "Development of Design Concept," and "any and all documents detailing design, engineering, construction and/or management plans" as to the Spectraserv contract or "prepared in connection with" certain scientific processes named in the Spectraserv contract.[2]
*235 Only eight days after it submitted its third OPRA request to the MCUA, Spectraserv, as noted, filed its construction lawsuit against the MCUA. Four days later, and within six business days of receiving this request, the MCUA responded by letter dated March 6, 2007. In what it termed its "preliminary response," the MCUA characterized the request as "vague, overbroad and unreasonable" in requiring the examination of "over nine years worth of files." Having met with agency employees on March 1, 2007 to begin identifying thirty file cabinets of documents and assessing the administrative burden of their review, counsel for the MCUA, in his response, also noted that "under relevant case law a public agency is not obligated to perform research assignments in response to an OPRA request but is only required to produce reasonably identified documents." Viewing many of the requested documents as confidential, proprietary or trade secrets under its licensing agreement with R3 Management, or otherwise privileged, the MCUA expressed its intention to withhold some of the requested records and to produce those it deemed exempt. In light of the construction complaint with which it had been served that very same week, alleging, in part, the inadequacy of the overall design, the MCUA proposed a compromise a coordinated production of documents, with Bates numbering for tracking compliance, to satisfy both the OPRA request and the anticipated discovery demands in litigation. Although no date was set for document production, the MCUA represented that it would endeavor to produce some or all of the records requested under OPRA in advance of any discovery deadline set in the construction lawsuit.
Spectraserv rejected the MCUA's proposal by letter of March 15, 2007 and demanded that the agency "make available for inspection within ten (10) days, all documents... that ... are not subject to any claim of privilege or protection." Thirteen days later, on March 28, 2007, Spectraserv filed the instant OPRA action by way of verified complaint and order to show cause, seeking, in addition to the requested documents, a statutory civil penalty of $1,000 and a reasonable attorney's fee pursuant to N.J.S.A. 47:1A-11 and N.J.S.A. 47:1A-6, respectively. The court set a return date of June 1, 2007.
Meanwhile, the MCUA began identifying, from the estimated 97,000 documents covered by the OPRA request, those it deemed confidential or privileged and advised Spectraserv on May 2, 2007 that it would make the remainder available for production upon a deposit for the copying costs. On May 7, 2007, Spectraserv objected to the MCUA scanning, copying or Bates numbering of any documents, asserting that inspection could easily be done on-site without sacrificing control, and demanded immediate access to all non-exempt documents. Thereafter, on May 18, 2007, the MCUA invited Spectraserv to inspect documents the agency deemed responsive after its review of four filing cabinet drawers of records and ten boxes of shop drawings. Spectraserv inspected these documents on May 31, 2007.
*236 Just one week prior to that inspection, on May 24, 2007, the managing director of BiopHast wrote the MCUA, objecting to its production of any documents related to the R3 Management technology covered by the confidentiality agreement as such records fell within OPRA's exception for "trade secrets and proprietary commercial or financial information obtained from any source." See N.J.S.A. 47:1A-1.1. As a result of BiopHast's position, the number of documents available for review on May 31st was greatly reduced.
The June 1st return date was rescheduled to June 6th and converted into a case management conference, at the conclusion of which the parties agreed that:
The Authority will produce for inspection pursuant to Spectraserv's OPRA request all public records, that is, responsive documents that are neither privileged nor over which BiopHast has claimed confidentiality, within seven to ten business days....
The MCUA was directed to produce confidentiality and privilege logs of all exempted documents within thirty days, by July 6, 2007.
Further inspection of documents by Spectraserv occurred on June 26, 2007 and July 2, 2007. Due to the volume of documents, the MCUA requested and was granted an extension of time for submitting its confidentiality and privilege logs. The agency produced these master logs on August 7, 2007, consisting of two volumes totaling 590 pages and listing 596 documents as privileged and 1848 documents as confidential. Thus, the MCUA originally withheld, as privileged or confidential, a total of 2444 documents out of approximately 150,000.
Thereafter, on September 12, 2007, BiopHast's counsel wrote the court advising that the licensor generally did not "object to Spectraserv's review of these documents subject to the entry of an appropriate protective order by this Court." This response prompted the judge to order the licensor to file a notice of motion to intervene in the pending litigation by November 5, 2007. Failure to do so would result in a waiver of BiopHast's right to object to the MCUA's production of any records protected under the licensing agreement. The licensor did not intervene by November 5, 2007, thus resolving all confidentiality issues. Consequently, the MCUA made the 1848 documents, once classified as "confidential," available for inspection and Spectraserv inspected these documents on November 15, 2007.
On December 14, 2007, over four months after the privilege log was produced, Spectraserv objected to more than half of the privilege designations. On February 7, 2008, the MCUA agreed to make available for inspection "certain correspondence and attachments" to 172 of the documents listed on the privilege log. Spectraserv then moved to compel the production of 167 other documents designated as privileged, which the MCUA opposed.[3] As a result, on May 9, 2008, the court appointed a special master to review the challenged documents.
The special master issued a privilege report on July 28, 2008, concluding that of the 347 documents reviewed, 171 of the withheld documents should have been produced in whole or in part. The MCUA filed objections with the judge, who, by order of October 24, 2008, affirmed the special master's findings and ordered the MCUA to produce the remaining documents as improperly withheld. *237 The agency fully complied. Thus, the MCUA ultimately produced 2239 of the 2444 documents originally designated as privileged or confidential, with the remaining 205 documents exempt from disclosure. Of the 2239 documents disclosed, only 171 documents were compelled by court order.
Spectraserv's December 24, 2008 application for attorney's fees and costs as a "prevailing party" under N.J.S.A. 47:1A-6 was also referred to the special master, who, on February 27, 2009, found that Spectraserv was entitled to the full amount of $121,520 it claimed as reimbursement. On October 7, 2009, the Law Division rejected the special master's finding and held that Spectraserv was not entitled to an award of attorney's fees because (1) its OPRA request was improper as overly broad and non-specific; and (2) the MCUA's March 6, 2007 response, suggesting a single production of records in response to both the OPRA request and discovery demands in the construction litigation, was reasonable. We agree.

I.
OPRA was intended to complement, enhance and maximize New Jersey's common law protections by providing its citizenry statutory rights to government maintained records. Educ. Law Ctr. v. N.J. Dep't of Educ, 198 N.J. 274, 283, 966 A.2d 1054 (2009); Mason v. City of Hoboken, 196 N.J. 51, 57, 951 A.2d 1017 (2008). Thus, unless otherwise exempted, OPRA requires that government records "be readily accessible for inspection, copying, or examination...." N.J.S.A. 47:1A-1.
The statute establishes specific means to effectuate this mandate. Custodians of public records must develop forms for OPRA requests that "provide space for... a brief description of the government record sought." N.J.S.A. 47:1A-5(f). In turn, the requestor must "submit the request with information that is essential to permit the custodian to comply with its obligations." N.J. Builders Ass'n v. N.J. Council on Affordable Hous., 390 N.J.Super. 166, 177, 915 A.2d 23 (App.Div.) (citing N.J.S.A. 47:1A-5(f), (g), (i)), certif. denied, 190 N.J. 394, 921 A.2d 448 (2007). In this regard, OPRA does not countenance "[w]holesale requests for general information," MAG Entm't, LLC v. Div. of Alcoholic Beverage Control, 375 N.J.Super. 534, 549, 868 A.2d 1067 (App.Div.2005), or open-ended demands "for every document a public agency has on file." Bent v. Stafford Twp. Police Dep't, 381 N.J.Super. 30, 37, 884 A.2d 240 (App.Div.2005). Rather, "OPRA requires a party requesting access to a public record to specifically describe the document sought," Gannett N.J. Partners L.P. v. County of Middlesex, 379 N.J.Super. 205, 212, 877 A.2d 330 (App. Div.2005), so that the records may be readily and reasonably identified within the short time frame within which government custodians must respond. Bent, supra, 381 N.J.Super. at 36-37, 884 A.2d 240. "As such, a proper request under OPRA must identify with reasonable clarity those documents that are desired, and a party cannot satisfy this requirement by simply requesting all of an agency's documents." Ibid. (emphasis in original).
The government custodian, on the other hand, must "locate and redact [the requested] documents, isolate exempt documents,... identify requests that require `extraordinary expenditure of time and effort' and warrant assessment of a `service charge,' and, when unable to comply with a request, `indicate the specific basis.'" N.J. Builders Ass'n, supra, 390 N.J.Super. at 177, 915 A.2d 23 (quoting N.J.S.A. 47:1A-5(a)-(j)). Unless a shorter time is otherwise prescribed, "a custodian of a government record shall grant access to a *238 government record or deny a request for access to a government record as soon as possible, but not later than seven business days after receiving the request, provided that the record is currently available and not in storage or archived." N.J.S.A. 47:1A-5(i). An exception to the seven-day business rule exists where the request for access "would substantially disrupt agency operations," in which event "the custodian may deny access to the record after attempting to reach a reasonable solution with the requestor that accommodates the interests of the requestor and the agency." N.J.S.A. 47:1A-5(g). Failure to respond within the allowable time, however, is the equivalent of a denial of the request. N.J.S.A. 47:1A-5(i).
A person denied access may either institute an action in the Law Division or file a complaint with the Government Records Council (GRC). N.J.S.A. 47:1A-6. A requestor who "prevails" is "entitled to a reasonable attorney's fee." Ibid.
In adopting OPRA, the Legislature declared that it is the public policy of this State to provide its citizens with the right to access government records. N.J.S.A. 47:1A-1. The fee-shifting provisions in OPRA are a vital means of fulfilling this promise. Without these provisions, the ordinary citizen would be waging a quixotic battle against a public entity vested with almost inexhaustible resources. By making the custodian of the government record responsible for the payment of counsel fees to a prevailing requestor, the Legislature intended to even the fight.
[Courier News v. Hunterdon County Prosecutor's Office, 378 N.J.Super. 539, 546, 876 A.2d 806 (App.Div.2005).]

II.
Spectraserv's claim of entitlement to attorney's fees is based upon its contention that the MCUA's March 6, 2007 response did not conform to OPRA's seven-day business rule because it neither provided prompt access to the government records sought nor otherwise fixed a date certain for the production of non-exempt documents. The rule, however, applies only if a proper OPRA request has been made. See N.J. Builders Ass'n, supra, 390 N.J.Super. at 179, 915 A.2d 23 (noting that "when a request is `complex' because it fails to specifically identify the documents sought, then that request is not `encompassed' by OPRA and OPRA's deadlines do not apply"). There, we found the requestor's five-page document listing thirty-eight separate requests for "any and all documents and data," id. at 172, 915 A.2d 23, and requiring a survey of agency employees to determine which documents they relied upon, considered or used in the agency's fair-share housing methodology, to be outside OPRA's scope. Id. at 179, 915 A.2d 23. Because the request in that case did not specifically identify the documents sought, "OPRA did not require [the agency] to produce the records within seven business days, N.J.S.A. 47:1A-5(i)." Id. at 171, 915 A.2d 23. For that very same reason, we also found that OPRA's related fee shifting provision had no application, id. at 179, 915 A.2d 23, and therefore held that the requestor "was not entitled to fees as a prevailing party under OPRA." Id. at 171, 915 A.2d 23.
The instant matter is strikingly similar. Thirteen of Spectraserv's sixteen requests with multiple subparts sought "any and all" documents from the MCUA. Of those, several requests failed to specify a specific document by date, title, and author and instead sought records that "reflect," "explain," "detail," or "demonstrate" the "rationale," "decision," or "purpose" of, among other things, various chemical processes of a highly technical and complex *239 nature. As if this were not sufficiently inclusive, Spectraserv's last request sought the agency's "entire project file."
We view Spectraserv's request as overly broad and generalized and therefore improper under OPRA. First, the sheer enormity and complexity of the request, involving approximately 150,000 documents, rendered agency compliance cumbersome and time consuming, involving an "extraordinary expenditure of time and effort." N.J.S.A. 47:1A-5(c). Moreover, Spectraserv's failure in many instances to clearly specify the documents sought necessitated the deployment of indisputably limited agency resources to sift through the MCUA's vast files and identify, analyze and select potentially relevant and responsive public records. Yet OPRA imposes no such obligation upon government custodians. See MAG, supra, 375 N.J.Super. at 549-50, 868 A.2d 1067. Relatedly, Spectraserv's request was also overbroad because it encompassed records that were exempt from disclosure under OPRA, as ultimately found by both the special master and the trial court, and which required further agency efforts to cull, isolate and evaluate. Indeed, of the 596 documents originally identified by the MCUA as privileged, 205 were eventually upheld by the court as exempt from disclosure and only 171, at most, were deemed otherwise.
Although the impropriety of the OPRA request is sufficient, in itself, to warrant denial of Spectraserv's counsel fee application, we do not rely on this reason alone in upholding the trial court's decision. We also find that the MCUA's March 6, 2007 reply was responsive to Spectraserv's demand and reasonable under the circumstances. Therein, the MCUA, in a timely manner, articulated a specific basis for its objection, characterizing the request as "vague, overbroad and unreasonable." Yet despite these reservations, the MCUA represented that it would withhold only those documents it deemed protected by the attorney-client privilege or that were confidential under its licensing agreement with R3 Management, and produce the rest. As to the latter, in light of the construction lawsuit just then commenced by Spectraserv, the MCUA recommended a coordinated production of documents to satisfy both the OPRA request and anticipated discovery demands.
As noted, OPRA recognizes an exception to the seven-day business rule and "authorizes custodians to propose a broad range of `reasonable solutions' that accommodate competing interests when compliance would substantially disrupt agency operations" and "clearly permits outright denial of these requests after an attempt to reach a reasonable and mutually accommodating solution." N.J. Builders Ass'n, supra, 390 N.J.Super. at 183, 915 A.2d 23 (citing N.J.S.A. 47:1A-5(g)). OPRA most certainly permits "consideration of demands on agency operations," id. at 184, 915 A.2d 23, and "encourages compromise and efforts to work through certain problematic requests" by "accommodating one another." Mason, supra, 196 N.J. at 76, 78, 951 A.2d 1017.
Contrary to Spectraserv's intimation, there is adequate proof that agency operations would be substantially disrupted by full compliance with the requestor's expansive document demands and truncated time frame. Spectraserv itself acknowledged the administrative burden in its March 15, 2007 rejection of the MCUA's counter-proposal. Aside from this concession, disruption may simply be inferred from the breadth, generality and complexity of the request at issue, which "necessitates work by [agency] employees that is neither assigned by the agency nor envisioned by OPRA." N.J. Builders Ass'n, supra, 390 N.J.Super. at 181, 915 *240 A.2d 23 ("A request that does not comply with OPRA and demands assessment and preliminary inquiry of the sort required by NJBA's demand is sufficient to give rise to an inference that compliance will `disrupt agency operations.'"). Here, it is undisputed that the MCUA had only very limited resources to sift through 150,000 documents, including highly technical materials, evaluate and identify those exempt from disclosure, and assess the remainder for relevance and responsiveness to Spectraserv's demands. This monumental task necessarily entailed a substantial disruption of agency operations and Spectraserv presents no proof to the contrary.
We also conclude that the MCUA offered a reasonable compromise to the unrealistically abbreviated temporal demands imposed by Spectraserv's OPRA request. Given the built-in delay occasioned by both the nature of the request itself and the involvement of an outside party (BiopHast) in its resolution, as well as the pendency of simultaneous litigation in the same forum, the alternative of a coordinated approach offered an effective and orderly mechanism for scheduling and tracking the production of documents and addressing any challenges thereto. The MCUA's solution was all the more reasonable given the likelihood that most, if not all, of the non-exempt documents covered by the OPRA request would have been discoverable in the construction litigation instituted by Spectraserv.
We fully recognize, of course, that "[a] party's right to access public records is not abridged because it may be involved in other litigation with the governmental agency required to respond to the OPRA request." MAG, supra, 375 N.J.Super. at 545, 868 A.2d 1067. In MAG, we noted:
The fact that litigation was pending between the ABC and MAG when MAG made its public records request does not, in itself, relieve the government agency of its obligation to comply with OPRA. Documents that are "governmental records" and subject to public access under OPRA are no less subject to public access because the requesting party is opposing the public entity in possession of material sought in collateral litigation.
[Id. at 544-45, 868 A.2d 1067 (internal citations omitted).]
Indeed, OPRA contemplates prompt production of documents well in advance of what the discovery rules command. Compare N.J.S.A. 47:1A-5(i) (requiring a response to an OPRA request within seven business days) with Rule 4:18-1(b)(2) (requiring parties to respond to document demands within thirty-five to fifty days after service).
Although the pendency of collateral litigation "neither diminishes nor expands the requestor's right of access to government records under OPRA," N.J. Builders Ass'n, supra, 390 N.J.Super. at 182, 915 A.2d 23, it is not a fact to be ignored. MAG, supra, 375 N.J.Super. at 549-50, 868 A.2d 1067. In MAG, we expressly disapproved of the use of OPRA "as an alternative to civil discovery, to obtain information previously denied" in an administrative enforcement action. Id. at 550. MAG involved an OPRA request by a retail liquor licensee for disclosure by the Division of Alcoholic Beverage Control, during pendency of the Division's enforcement action against the licensee, of records regarding the Division's handling of other enforcement actions against similarly situated liquor licensees. Id. at 539-40, 868 A.2d 1067. In denying the OPRA request as "a broad-based demand for research and analysis, decidedly outside the statutory ambit," id. at 550, 868 A.2d 1067, we noted: "Although the purpose or motive for which information is sought is generally *241 immaterial to the disclosure determination under OPRA, here the manner in which [the requestor] attempted to use OPRA as a vehicle to transfer management of the discovery process in the administrative proceeding from the ALJ to the Law Division was patently improper." Id. at 543, 868 A.2d 1067.
Here, the MCUA complains that Spectraserv improperly used OPRA as a means of achieving an unfair advantage in the construction litigation and recouping its discovery costs therein. Certainly, misuse of OPRA as a calculated, tactical discovery weapon in pending litigation to obtain the reward of "prevailing party" fees is not within the statute's intendment and should not be countenanced. While we venture no opinion as to the true purpose of the OPRA request in this instance, we simply note that there appears to be no identifiable documents available to Spectraserv under OPRA that would not have otherwise been discoverable in the construction lawsuit. And although OPRA clearly contemplates the production of such records on an accelerated basis, Spectraserv's demand does not so qualify because, for reasons already stated, it was not authorized by law.

III.
Spectraserv nevertheless argues that because the MCUA never flatly rejected the OPRA request, the agency relinquished its right to later challenge the demand as improper. In other words, since the request was subject to outright denial in the first instance, any agency response short of straightforward rejection constitutes a waiver of its right to thereafter object to the request as invalid. We disagree.
"Common sense precludes an assumption that the Legislature would intend to permit denial but prohibit reasonable solutions that involve brief delay." N.J. Builders Ass'n, supra, 390 N.J.Super. at 183, 915 A.2d 23. Indeed, such an assumption goes against the "cooperative balance" OPRA strives to attain. Mason, supra, 196 N.J. at 78, 951 A.2d 1017. Under Spectraserv's argument,
plaintiffs would have an incentive to file suit immediately after a request for disclosure is denied or not responded to in a timely fashion, based in part on the expectation of an award of attorney's fees. Agencies, in turn, would have reason not to disclose documents voluntarily after the filing of a lawsuit. If they did, they would be presumed liable for fees. As a result, courts could expect to see more aggressive litigation tactics and fewer efforts at accommodation. And in the former instances, OPRA cases designed to obtain swift access to government records would end up as battles over attorney's fees.
[Id. at 78-79, 951 A.2d 1017.]
These are consequences not contemplated by OPRA and therefore we reject Spectraserv's waiver argument as unsound and without merit.

IV.
To reiterate, Spectraserv is not entitled to attorney's fees because its OPRA request was improper and the MCUA's response was reasonable. To be sure, "[a] requestor is not outright disqualified from entitlement to fees because the original request was too broad. ..." Asbury Park Press v. County of Monmouth, 406 N.J.Super. 1, 12, 966 A.2d 75 (App.Div. 2009), aff'd, 201 N.J. 5, 986 A.2d 678 (2010). Spectraserv, however, never conformed its demand to OPRA's requirements and therefore cannot be considered a "prevailing party."
*242 "In determining the propriety of an award of attorney fees, the court must first determine whether one qualifies as a `prevailing party.'" N. Jersey Media Group Inc. v. State, Dep't of Personnel, 389 N.J.Super. 527, 540, 913 A.2d 853 (Law Div.2006) (quoting Dunn v. Dep't of Human Servs., 312 N.J.Super. 321, 332, 711 A.2d 944 (App.Div.1998)) (finding that, despite entitlement to some information within government records, the plaintiff was not considered a prevailing party). A requestor, however, is not a prevailing party simply because the agency produced documents after an OPRA suit was filed. Mason, supra, 196 N.J. at 78, 951 A.2d 1017. Rather, a complainant is a "prevailing party" if he or she achieves the desired result because the complaint brought about change (voluntary or otherwise) in the custodian's conduct. Teeters v. Div. of Youth & Family Servs., 387 N.J.Super. 423, 432, 904 A.2d 747 (App.Div.2006) (quoting Warrington v. Vill. Supermarket, Inc., 328 N.J.Super. 410, 420, 746 A.2d 61 (App.Div.2000)), certif. denied, 189 N.J. 426, 915 A.2d 1049 (2007); see also Farrar v. Hobby, 506 U.S. 103, 111-12, 113 S.Ct. 566, 573, 121 L.Ed.2d 494, 503 (1992). In Mason, supra, the Court held that "requestors are entitled to attorney's fees under OPRA, absent a judgment or an enforceable consent decree, when they can demonstrate (1) `a factual causal nexus between plaintiff's litigation and the relief ultimately achieved'; and (2) `that the relief ultimately secured by plaintiffs had a basis in law.'" 196 N.J. at 76, 951 A.2d 1017 (quoting Singer v. State, 95 N.J. 487, 494, 472 A.2d 138 (1984)).
Aside from the lack of any legal basis for the relief sought, absent here is any causal connection between Spectraserv's OPRA complaint and the production of documents by the MCUA. From the very inception, in its initial response of March 2007 to Spectraserv's letter request, the MCUA acknowledged its obligation to produce non-exempt documents and, in fact, made many of these documents available for inspection in advance of any court intervention or directive. As for the remainder, three weeks before Spectraserv filed its OPRA complaint, the MCUA proposed the very solution ultimately adopted, in large measure, by the trial court to address disclosure issues common to both lawsuits. The MCUA also immediately took steps to cull and isolate from its voluminous records those it deemed privileged and confidential. As to the latter, as soon as its licensor withdrew its objection by failing to intervene, the MCUA made available all 1848 documents once considered confidential. In fact, in the interim, the court itself allowed the MCUA to withhold these documents while it gave BiopHast forty-five days to intervene and assert confidentiality. As for the other 347 records designated "privileged," given the commonality of subject matter, the court would have had to make the same determination in the context of litigation discovery under Rule 4:10-2. Thus, under the circumstances, it cannot be said that Spectraserv's OPRA complaint caused the production of documents that would not have been produced otherwise.
Affirmed.
NOTES
[1] BiopHast Technologies Ltd. (BiopHast) subsequently became the assignee of R3 Management and its technologies, which included the licensing and confidentiality agreement entered into with the MCUA.
[2] As to the latter, paragraphs 6 and 7 requested:

6. Any and all documents prepared in connection with Contract 02-10-3 that reflect or explain the following:
a. the rationale behind using pulverized calcium oxide in the admixture silo and feed systems and any comparison of pulverized calcium oxide to hydrated CaO or CaOH;
b. the decision not to use pulverized fly ash, ground limestone or lime kiln dust in the admixture silo and feed systems;
....
7. Any and all documents prepared in connection with Contract 02-10-3, detailing the chemical equations used in the conceptual design phase of the Project that demonstrate the feasibility of the admixture feed and mixing process....
[3] Fifteen of the 167 privileged documents referred to in Spectraserv's motion were available for inspection with the documents identified in the MCUA's February 7, 2008 letter.