SMITH, Chief Judge.
In 2015, Pulitzer Prize-winning journalist Daniel Golden and publicist Tracy Locke were conducting research for Golden's then-forthcoming book, Spy Schools: How the CIA, FBI, and Foreign Intelligence Secretly Exploit America's Universities .[1] As part of that research, Golden and Locke invoked open records laws to request documents from public universities. From April to August of 2015, Golden and Locke submitted three records requests to the New Jersey Institute of Technology ("NJIT") under New Jersey's Open Public Records Act, N.J. Stat. Ann. §§ 47:1A-1 - 47:1A-13 ("OPRA"). Many of NJIT's documents that were responsive to the OPRA requests originated with the Federal Bureau of Investigation ("FBI" or "the Bureau") and were subject to prohibitions on public dissemination. NJIT's custodian of records, Clara Williams, therefore asked the FBI to advise NJIT as to whether it should allow access to the records. In no uncertain terms, the FBI directed NJIT to withhold most of the records. NJIT obliged, claiming that the documents were exempt from disclosure. This lawsuit followed.
After removal of this case to federal court, NJIT and the FBI agreed to reexamine the previously withheld records. As a result of that review, NJIT produced thousands of pages of documents it had formerly deemed exempt. Golden and *305 Locke then moved for attorneys' fees under OPRA, which mandates a fee award for prevailing plaintiffs. See N.J. Stat. Ann. § 47:1A-6. The District Court denied the fee motion, holding that no nexus existed between the lawsuit filed by Golden and Locke and the eventual release of records. The Court was persuaded by NJIT's position that it had acted reasonably in following the FBI's direction.
We disagree with both the District Court's conclusion and its misplaced focus on reasonableness. Under the catalyst theory, as adopted by the Supreme Court of New Jersey, plaintiffs are entitled to attorneys' fees if there exists "a factual causal nexus between [the] litigation and the relief ultimately achieved" and if "the relief ultimately secured by plaintiffs had a basis in law." Mason v. City of Hoboken , 196 N.J. 51, 951 A.2d 1017, 1032 (2008) (quoting Singer v. State , 95 N.J. 487, 472 A.2d 138, 142 (1984) ). Before Golden and Locke filed suit, NJIT had asserted OPRA exemptions to justify withholding the majority of the requested records. Post-lawsuit, NJIT abandoned its reliance on those exemptions and produced most of the records. Golden and Locke's lawsuit was the catalyst for the production of documents and thereby satisfied the Mason test. That NJIT withheld records at the behest of the FBI does not afford it a basis to abdicate its role as the records custodian. NJIT alone bore the burden of allowing or denying access to the requested records. With that burden comes the attendant responsibility of paying attorneys' fees to a prevailing plaintiff. We will therefore reverse and remand for the calculation of attorneys' fees.
I.
A.
Enacted in 2002, the purpose of OPRA is "to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process." Id. at 1025 (quoting Asbury Park Press v. Ocean Cty. Prosecutor's Office , 374 N.J.Super. 312, 864 A.2d 446, 458 (Law Div. 2004) ). To effectuate that purpose, OPRA outlines a procedure to ensure that "government records shall be readily accessible for inspection, copying, or examination by the citizens of [New Jersey.]"[2] Id. (quoting N.J. Stat. Ann. § 47:1A-1 ). And OPRA requires every "[p]ublic agency," including NJIT, to designate a records custodian. See N.J. Stat. Ann. § 47:1A-1.1. A records custodian is, as relevant here, "the officer officially designated by formal action of [the] agency's director or governing body." Id.
A person seeking government records must submit to the records custodian a written request for access that is "hand-delivered, mailed, transmitted electronically, or otherwise conveyed." Id. § 47:1A-5(g). Once that request is made, the custodian "shall permit the record to be inspected, examined, and copied by any person during regular business hours" unless the record is exempt from access.[3] Id. § 47:1A-5(a).
*306 The agency may charge a nominal fee for the cost of duplicating records, id. § 47:1A-5(b)(1), as well as a special service charge for requests that "involv[e] an extraordinary expenditure of time and effort," id. § 47:1A-5(c).
Absent any applicable exemptions,[4] the records custodian must generally disclose government records no later than seven business days after receiving the request.[5] Id. § 47:1A-5(i ). If the custodian cannot comply with the request, she must "indicate the specific basis therefor on the request form and promptly return it to the requestor." Id. § 47:1A-5(g). In the event a request for access "would substantially disrupt agency operations," the custodian must "attempt[ ] to reach a reasonable solution with the requestor that accommodates the interests of the requestor and the agency" before denying access. Id. If the custodian fails to respond to a request within seven business days, she is deemed to have denied the request. Id. § 47:1A-5(i ).
If the records custodian denies access to a government record, the requestor has two options: file a lawsuit in the New Jersey Superior Court, Law Division, or a complaint with the Government Records Council. Id. § 47:1A-6. Either action "shall proceed in a summary or expedited manner," with the public agency bearing "the burden of proving that the denial of access is authorized by law." Id.
"OPRA provides for attorney's fees and civil penalties in certain circumstances." Mason , 951 A.2d at 1026. "A requestor who prevails in any proceeding shall be entitled to a reasonable attorney's fee." N.J. Stat. Ann. § 47:1A-6. Moreover, if a records custodian "knowingly and willfully violates [OPRA] ... and is found to have unreasonably denied access under the totality of the circumstances," she is subject to a range of civil penalties, as well as appropriate disciplinary action. Id. § 47:1A-11(a).
B.
In 2015, Golden and Locke were conducting research for a book Golden was writing that would examine foreign and domestic intelligence activities at United States universities. On April 8, 2015, Golden submitted the first OPRA request to Williams, NJIT's records custodian. The first request sought
(1) "all e-mail communications since January 1, 2010, between the Central Intelligence Agency or its representatives using the email domains @ucia.gov, @cia.gov, or any other address, and the following people at the New Jersey Institute of Technology: the president, chancellor(s), *307 provost(s), vice provost(s), vice presidents, deans, general counsel, assistant general counsel, outside counsel, and campus police chief"; and
(2) "all e-mail communications since January 1, 2010, between the Federal Bureau of Investigation or its representatives using the email domains @ic.fbi.gov, @fbi.gov, or any other email address, and the same people at NJIT."
App. 58. NJIT staff accessed the computer system to search for the email extensions contained in Golden's request. NJIT located over 1,400 emails, which Williams began to review and print. Due to the volume of emails, Williams asked for and received from Golden an extension of the seven-day OPRA deadline to turn over records covered by the request.
During Williams's review, she discovered that many of the emails-which were mostly from the FBI to NJIT-contained dissemination controls.[6] For example, some emails warned, "do not disclose," or "proprietary and confidential information." App. 213, ¶ 27. Williams believed that these emails likely fell within OPRA's exemption for third-party confidential information, and she notified the FBI of the first request and the responsive emails. In turn, the FBI told Williams that it would need to review all of the emails before she disclosed them to Golden.
In May 2015, FBI agents visited NJIT to review the emails Williams had compiled. The FBI advised Williams "that any emails directed to and received from the FBI are deemed FBI records and, as such, are the property of the United States Government." App. 214, ¶ 31. The FBI also told Williams that it, not NJIT, "is cloaked with full and exclusive authority to determine whether or not any such email is subject to disclosure." App. 214, ¶ 31. The FBI redacted some emails and marked others as classified. The FBI instructed Williams to produce certain records and to withhold others.
On May 29, 2015, Williams responded to Golden's first request. NJIT produced approximately 540 pages of records, many of which were redacted. NJIT also withheld 3,949 pages, citing several OPRA exemptions. See App. 61-62 (citing, inter alia , exemptions for domestic security and documents that would be exempt under federal law, including the federal Freedom of Information Act ("FOIA")). Williams's response included a letter from the FBI memorializing its directive to withhold the records.
Approximately two months later, on July 28, 2015, Locke submitted to NJIT a second OPRA request, which was identical to the first request. The following day, Williams contacted the FBI to advise it of the second request and to confirm her understanding that NJIT was prohibited from releasing any additional records. Williams then denied Locke's request; citing many of the same OPRA exemptions as before, Williams advised that NJIT would not produce any additional records and enclosed the FBI's May 2015 letter prohibiting disclosure.
Just a few weeks later, on August 13, 2015, Golden submitted a third OPRA request. The third request mirrored the first and second requests. Noticing this duplication, Williams asked Golden if he had submitted the request in error; he responded that the third request was broader than the first two because it sought records through the date of the most recent request. After again consulting with the FBI, Williams denied the third request pursuant *308 to the same OPRA exemptions and enclosed the FBI's May 2015 letter.
C.
Roughly a month later, in September 2015, Golden and Locke sued NJIT and Williams under OPRA and New Jersey's common law right of access in the Superior Court of New Jersey Law Division, Essex County.[7] The Court issued a show cause order to NJIT.[8] Although the FBI initially told NJIT it would intervene in the lawsuit, the Bureau opted not to do so. As a result, NJIT filed a third-party complaint against the FBI for indemnification in the event the Court awarded Golden and Locke attorneys' fees.
In December 2015, the FBI removed the case to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1442(a)(1). The FBI counterclaimed against NJIT, seeking declaratory and injunctive relief to prevent NJIT from releasing responsive records to Golden and Locke. The Court stayed all discovery in the case pending a status conference.
Beginning in January 2016, the Magistrate Judge to whom the case was referred held a series of status conferences with the parties. As of February 2016, NJIT and the FBI possessed approximately 6,000 pages of undisclosed documents responsive to the OPRA requests. Of the 6,000 pages, the Bureau claimed that 4,000 were federal records that were purportedly exempt from disclosure under OPRA. The FBI agreed to treat the remaining 2,000 pages as a request from NJIT to consult, and the Bureau would review the documents at a rate of 500 pages per month. Although Golden and Locke did not agree with the FBI's position as to the 4,000 purportedly exempt pages, all parties agreed to the consultation procedure. Given the progress, the Magistrate Judge stayed the case.
In June 2016, the FBI reported that it had reviewed approximately 2,000 pages of responsive records. The FBI redacted and returned the documents to NJIT, "which in turn produced the redacted documents to Plaintiffs in accordance with FBI protocols for consultation requests." App. 143. The FBI also undertook "a further cursory review" of the remaining purportedly exempt pages and agreed to review them at a rate of 500 pages per month. App. 143.
In October 2016, the FBI finished its review of the 6,000 pages. NJIT produced 3,445 unredacted pages and 379 partially redacted pages.[9] NJIT withheld 26 pages pursuant to a FOIA exemption and 1,614 pages because the FBI asserted control over those documents. The Bureau agreed to provide Golden and Locke with additional information concerning the withheld documents in an effort to narrow the issues for judicial review.
In January 2017, the parties reported that they had "made substantial progress in narrowing the issues to be litigated." App. 151. Golden and Locke agreed not to challenge a substantial number of the withheld documents. They also provided NJIT and the FBI with a list of specific withheld documents that they wanted the Bureau to revisit. In February 2017, the FBI produced additional records. In light of upcoming publication deadlines for *309 Golden's book, he and Locke opted not to challenge the remainder of the withheld documents. The parties advised the Magistrate Judge that the only issue that remained to be resolved was Golden and Locke's forthcoming motion for attorneys' fees as prevailing parties under OPRA.
Golden and Locke filed a motion for attorneys' fees in November 2017, seeking $197,829.50. NJIT opposed the motion. In April 2018, the Magistrate Judge issued a Report and Recommendation ("R&R") recommending that the District Court deny the fee motion. The Magistrate Judge believed that no causal nexus existed between Golden and Locke's lawsuit and the production of records. The Magistrate Judge reasoned that because the FBI-not NJIT-asserted and then abandoned OPRA exemptions, NJIT's conduct was "unaffected and unchanged" by the filing of the lawsuit. App. 23. The Magistrate Judge also ruled that NJIT's conduct was reasonable. Golden and Locke objected to the R&R.
On August 2, 2018, the District Court adopted the R&R and denied Golden and Locke's fee motion. Like the Magistrate Judge, the District Court considered NJIT's conduct to be "reasonable in light of the FBI's repeated demand that NJIT not release records without its approval, NJIT's consistent position to Plaintiffs that it would not do so, and its attempts to facilitate a resolution for Plaintiffs." App. 7. The District Court also agreed with the Magistrate Judge that, while the FBI's conduct had changed because of the lawsuit, NJIT had not altered its position.
Golden and Locke timely appealed.
II.
Neither of the parties questioned the District Court's jurisdiction, nor did the Court raise the issue sua sponte . We, however, must fulfill our "independent obligation" to ensure that jurisdiction exists.[10] N.J. Carpenters and Trs. Thereof v. Tishman Constr. Corp. of N.J. , 760 F.3d 297, 302 (3d Cir. 2014) (internal quotation marks omitted). The FBI removed this case under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). The "central aim" of the federal officer removal statute "is [to] protect[ ] officers of the federal government from interference by litigation in state court while those officers are trying to carry out their duties." Papp v. Fore-Kast Sales Co., Inc. , 842 F.3d 805, 811 (3d Cir. 2016). To achieve that end, "the federal officer removal statute is to be broadly construed in favor of a federal forum." Id. (internal quotation marks omitted). Four requirements must be satisfied before a district court may assert jurisdiction under § 1442(a)(1) : (1) "the defendant is a person within the meaning of the statute"; (2) "the plaintiff's claims are based upon the defendant's conduct acting under the United States, its agencies, or its officers"; (3) "the plaintiff's claims against the defendant are for, or relating to an act under color of federal office"; and (4) "the defendant raises a colorable federal defense to the plaintiff's claims." Id. at 812 (alterations and internal quotation marks omitted).
The FBI's notice of removal cites only the applicable statute, § 1442(a)(1), and concludes that the action is removable "because it involves a civil action against the FBI-an agency of the United States." Notice of Removal at 3, ¶ 8, *310 Golden v. N.J. Inst. of Tech. , No. 2:15-cv-08559 (D.N.J. Dec. 11, 2015), ECF No. 1. Although the notice of removal is facially inadequate,[11] we conclude after independently reviewing the record that the four requirements for jurisdiction are easily satisfied here.
The FBI is a federal agency, which fulfills the first requirement. See 28 U.S.C. § 1442(a)(1) (permitting "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof" to remove a case under § 1442(a)(1) ).
The second requirement, that NJIT's claims be based upon the FBI's "conduct acting under the United States, its agencies, or its officers," is "liberally construed to cover actions that involve an effort to assist, or to help carry out, the federal supervisor's duties or tasks." Papp , 842 F.3d at 812 (alteration and internal quotation marks omitted). This requirement is also easily met here. For example, the FBI alleges that it directed NJIT to withhold certain records that "contain critical intelligence to detect and prevent violent crime and terrorism in the United States before such acts occur." App. 132, ¶ 60. Clearly, the FBI's conduct-directing NJIT to withhold such records-was "assisting," or helping to effectuate, "the duties or tasks" of the United States, to wit, protecting citizens from crime and terrorism. In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila. , 790 F.3d 457, 468 (3d Cir. 2015) (internal quotation marks omitted). The FBI was thus "acting under" the United States.
The third requirement is that "the plaintiff's claims against the defendant [be] for, or relating to an act under color of federal office." Papp , 842 F.3d at 812 (alteration and internal quotation marks omitted). To meet this requirement, "it is sufficient for there to be a 'connection' or 'association' between the act in question and the federal office." Def. Ass'n , 790 F.3d at 471. Here, the FBI asserted that certain of NJIT's documents were property of the United States and demanded that NJIT withhold those documents to protect the United States' confidentiality interests. See App. 100, ¶ 8 (third-party complaint, alleging that the FBI sought withholding of certain records because "the information is law enforcement sensitive and may implicate criminal and/or national security interests"). The FBI has thereby set forth a "connection or association" between the Bureau's actions and the United States, and the acts at issue thus satisfy the "under color of federal office" requirement.
Finally, jurisdiction can exist under § 1442(a)(1) only if "the defendant raises a colorable federal defense to the plaintiff's claims." Papp , 842 F.3d at 812 (alterations and internal quotation marks omitted). For purposes of federal officer removal jurisdiction, a defense is "colorable" if it is "legitimate and [can] reasonably be asserted, given the facts presented and the current law." Id. at 815 ; see also Jefferson Cty. v. Acker , 527 U.S. 423, 431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999) (rejecting "a narrow, grudging interpretation" of § 1442(a) 's colorable federal defense requirement). The FBI raises several defenses to NJIT's claims, but it is sufficient for our purposes to focus on just one-that the disputed records are "federal records" not subject to OPRA.[12]
*311 The FBI alleges that the disputed records are federal records within the meaning of 44 U.S.C. § 3301 and that, as such, these records are not subject to OPRA and cannot be disclosed to Golden and Locke under that statute. In other words, the FBI argues that its status as a federal agency and the resulting status of the records as federal records precludes enforcement of state law. This defense is similar to other colorable federal defenses centering on potential state interference with a federal agency. See, e.g. , Def. Ass'n , 790 F.3d at 474 (explaining that the defendant had raised a colorable federal defense by claiming that the Commonwealth was preempted, under Buckman Co. v. Plaintiffs' Legal Committee , 531 U.S. 341, 347-48, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), from interfering in the defendant's relationship with a federal agency); see also Acker , 527 U.S. at 431, 119 S.Ct. 2069 (holding that the defendants had raised a colorable federal defense by alleging that a state tax interfered with the operation of the federal judiciary, in violation of the intergovernmental tax immunity doctrine). We need not, and do not, pass on the merits of the FBI's defense. For jurisdictional purposes, it is sufficient that the FBI has raised a colorable federal defense under § 1442(a)(1). See Papp , 842 F.3d at 815 ("A defendant need not win his case before he can have it removed." (internal quotation marks omitted)). We are satisfied that the four prerequisites for § 1442(a)(1) jurisdiction are met.[13]
The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1442(a)(1) and 1367, and we exercise jurisdiction under 28 U.S.C. § 1291.
III.
On appeal, Golden and Locke argue that, as prevailing plaintiffs, they are entitled to a mandatory award of attorneys' fees under OPRA.[14] As they see it, the calculus is simple: pre-suit, NJIT withheld thousands of pages of records pursuant to OPRA exemptions, only to abandon its resort to those exemptions by releasing the records after the lawsuit was filed. As NJIT would have it, the analysis is not quite so straightforward because the FBI was directing NJIT to withhold the records. That directive, NJIT contends, renders its actions reasonable and permissible under OPRA.
A.
Under OPRA, "[a] requestor who prevails in any proceeding shall be entitled to a reasonable attorney's fee." N.J. Stat. Ann. § 47:1A-6 ; see Teeters v. Div. of Youth & Family Servs. , 387 N.J.Super. 423, 904 A.2d 747, 752 (App. Div. 2006) (describing OPRA's "shall be entitled" language as "mandatory"). A requestor is a so-called "prevailing party if he or she achieves the desired result because the complaint brought about change (voluntary or otherwise) in the custodian's conduct." Spectraserv, Inc. v. Middlesex Cty. Utils. Auth. , 416 N.J.Super. 565, 7 A.3d 231, 242 (App. Div. 2010) (internal quotation marks omitted).
*312 An OPRA requestor need not secure a judicial order compelling the release of records to be entitled to attorneys' fees. Rather, under the catalyst theory adopted by New Jersey courts, "prevailing plaintiffs" may attain attorneys' fees when, like Golden and Locke, they obtain records "when a government agency voluntarily discloses [them] after a lawsuit is filed." Mason , 951 A.2d at 1021. Such plaintiffs are entitled to fees if they can demonstrate (1) "a factual causal nexus between plaintiff's litigation and the relief ultimately achieved"; and (2) that "the relief ultimately secured by plaintiffs had a basis in law."[15] Id. at 1032. This assessment is fact-sensitive and evaluates "the reasonableness of, and motivations for, an agency's decisions." Id. at 1033. The dispute in this case centers on the first prong-whether there exists a factual causal nexus between Golden and Locke's lawsuit and the release of the disputed records, as both parties have conceded the second prong is met.
Golden and Locke have proven a factual causal nexus between their lawsuit and the release of records. Before the lawsuit, NJIT refused to release the majority of documents responsive to the first OPRA request and completely denied the second and third requests. After Golden and Locke filed suit, NJIT agreed to the FBI's consultation procedure and subsequently released 3,445 unredacted pages and 379 partially redacted pages. By releasing these previously withheld records, NJIT abandoned any reliance on the OPRA exemptions it had formerly asserted. There is no indication in the record that NJIT would have produced the previously withheld documents absent Golden and Locke's lawsuit. On the contrary, NJIT allowed access to the records only after a lengthy, cooperative process overseen by the Magistrate Judge. It is clear, then, that Golden and Locke's lawsuit was the catalyst for the release of records.
B.
That NJIT chose to rely upon the FBI's directives does not change our conclusion. As discussed supra , the catalyst theory focuses on whether there exists "a factual causal nexus between [the] litigation and the relief ultimately achieved" and whether the relief awarded "had a basis in law." Mason , 951 A.2d at 1032 (internal quotation marks omitted). OPRA makes clear that a records custodian-not a third-party-has the duty to decide whether to allow or deny access to records.[16] See N.J. Stat. Ann. § 47:1A-5(a), (g). That duty is accompanied by the burden of paying attorneys' fees if the custodian wrongly decides not to disclose records.
*313 See Courier News v. Hunterdon Cty. Prosecutor's Office , 378 N.J.Super. 539, 876 A.2d 806, 811 (App. Div. 2005). To the extent NJIT's withholding was involuntary due to the FBI's directives, such involuntariness is irrelevant to our inquiry under the statute. See Spectraserv, Inc. , 7 A.3d at 242 (acknowledging that a third party's interest does not supersede the records custodian's obligation to produce non-exempt documents).
In Courier News , the Superior Court of New Jersey Appellate Division considered a question similar to that presented here-whether a records custodian or a third party with an interest in the disputed records was liable for attorneys' fees under OPRA. See 876 A.2d at 807-08. In a previous appeal, the Appellate Division had determined that a tape recording of a 911 call in the custody of the Hunterdon County Prosecutor's Office (the "County") was subject to disclosure under OPRA. Id. at 808-09. The Appellate Division remanded to allow the trial judge to consider an award of attorneys' fees. Id. at 809. The County contended that the State was responsible for attorneys' fees; it therefore joined the State as a third-party defendant. Id. at 807, 809. The trial judge ruled that the State had to pay the plaintiff's attorneys' fees because the County "had been performing a state law enforcement function when it denied plaintiff access to the tape." Id. at 808. The Appellate Division disagreed, holding "that as the custodian of the government record at issue here, the [County] is responsible under OPRA to pay plaintiff's counsel fees." Id. The Appellate Division relied for its conclusion on the text of OPRA, which repeatedly discusses the custodian's obligation to allow or deny access to records. Id. at 810. Because "it [was] undisputed that [the County] was the custodian of the 911 tape," it was responsible for paying attorneys' fees. Id. The Appellate Division "discern[ed] no legal basis to shift this financial burden to the State." Id. at 811.
Similarly, in K.L. v. Evesham Township Board of Education , the father of two elementary school children invoked OPRA in seeking school records about alleged incidents of bullying. 423 N.J.Super. 337, 32 A.3d 1136, 1140 (App. Div. 2011). The Board of Education refused to produce any records, asserting certain exemptions to protect the privacy of other students. Id. at 1140-41. After the father filed suit, the trial court ordered the Board to contact the parent of another child involved in an alleged bullying incident to seek permission to release the record. Id. at 1141. The other parent had no objection to the Board's disclosure of the record, provided her child's name was redacted. Id. The Board therefore released a redacted document that detailed the disciplining of another student for violent conduct against one of the father's children. Id. Notwithstanding the father's success in securing the release of the record, the trial court denied attorneys' fees under OPRA. Id. at 1142. The Appellate Division reversed. Id. at 1150. It held that the father had proven that his lawsuit was the catalyst for disclosure of the document because "the Board declined to disclose the document until plaintiff filed his OPRA lawsuit and the court ordered in camera review." Id. The father was thereby entitled to attorneys' fees as a prevailing plaintiff. Id. at 1151. In that case, as here, it was not dispositive that a third party had a confidentiality interest in the disputed document. See id. at 1150-51.
These authorities, taken together, lead us to one conclusion-it is of no moment that the FBI directed NJIT to withhold the disputed records. NJIT, as the records custodian, bore the duty under OPRA to decide whether to release or withhold the records Golden and Locke sought, as well *314 as the burden to pay attorneys' fees if it made the wrong decision. In making its decision, NJIT was free to consult with the FBI to determine whether disclosure would impinge upon any of the FBI's interests. See, e.g. , Gannett N.J. Partners, LP v. Cty. of Middlesex , 379 N.J.Super. 205, 877 A.2d 330, 335 (App. Div. 2005) (instructing records custodians who are not in a position to assess whether disclosure of a government record would impact the confidentiality interests of another agency to consult with "[t]he party with the interest in maintaining the confidentiality of [the disputed records] and the capacity to explain the need for that confidentiality"). NJIT did not err by advising the FBI that its interests may be affected by production of the documents or by seeking the FBI's position as to whether disclosure would be proper. Where NJIT went astray was in failing to exercise independent judgment and, instead, unquestioningly obeying the FBI's orders to withhold the records. NJIT is responsible for that choice and must bear the consequences, i.e., paying attorneys' fees.
C.
In a final attempt to avoid liability, NJIT argues that the New Jersey Supreme Court in Mason imposed a requirement of reasonableness on parties in an OPRA dispute. See Mason , 951 A.2d at 1033. According to NJIT, its own actions were eminently reasonable, thus immunizing it from any obligation to pay attorneys' fees.
NJIT's proffered interpretation of Mason is unpersuasive. There, the Supreme Court rejected the plaintiff's argument that OPRA includes a rebuttable presumption that attorneys' fees are warranted whenever a defendant discloses a record post-lawsuit. Id. at 1032-33. The Court instead adopted the catalyst theory-that a requestor is entitled to attorneys' fees only if he can demonstrate "a factual causal nexus between [the] litigation and the relief ultimately achieved," and "that the relief ultimately secured ... had a basis in law." Id. at 1032. The Supreme Court explained: "[t]rial courts would conduct that fact-sensitive inquiry on a case-by-case basis, evaluating the reasonableness of, and motivations for, an agency's decisions, and viewing each matter on its merits." Id. at 1033.
The Supreme Court's reference to "reasonableness" in Mason is best read in light of its facts. There, the agency had attempted to work with the requestor to produce records well before the requestor filed suit. Id. at 1021-22. In the midst of attempting to fulfill the plaintiff's record request, the records custodian was also caring for his critically ill mother, who died the day before the requestor filed suit. Id. In assessing whether attorneys' fees were warranted, the Supreme Court focused on the reasonableness of the agency's efforts to produce records to the requestor: the agency's immediate response that certain records were temporarily unavailable, the illness and death of the records custodian's mother, and the agency's production of some records around the time the requestor filed suit. Id. at 1034. "Because [the agency] had agreed to plaintiff's request before she even filed suit, she cannot establish that her lawsuit entitles her to fees under the catalyst theory." Id. at 1034-35 ; see also Spectraserv, Inc. , 7 A.3d at 239, 241-42 (ruling that the agency's actions were reasonable-and that attorneys' fees were thus unwarranted-due in part to the agency's pre-suit attempts to accommodate the requestor's demands). We thus conclude that the "reasonableness" language in Mason refers to the reasonableness of an agency's efforts to comply with a document request before a lawsuit is filed-not *315 whether the proffered basis for denying access is reasonable. See N.J. Stat. Ann. § 47:1A-5(g) (explaining that the custodian must "attempt[ ] to reach a reasonable solution with the requestor" if a request for access "would substantially disrupt agency operations").
The plain language of the statute reinforces our conclusion. OPRA's attorneys' fees provision does not include a reasonableness requirement, except as to the amount of any fee ultimately awarded. Id. § 47:1A-6 ("A requestor who prevails in any proceeding shall be entitled to a reasonable attorney's fee." (emphasis added)). By way of contrast, OPRA's civil penalty provision does contain an "unreasonableness" requirement. See id. § 47:1A-11(a) (providing for statutory penalties when a custodian "knowingly and willfully violates [OPRA] ... and is found to have unreasonably denied access under the totality of the circumstances" (emphasis added)). This contrasting language leads us to conclude that OPRA mandates attorneys' fees in the mine run of cases but reserves civil penalties for unreasonable denials of access. See Smith v. Hudson Cty. Register , 422 N.J.Super. 387, 29 A.3d 313, 319 (App. Div. 2011) (rejecting the agency's argument that "it is inappropriate here to compel [it] to pay counsel fees because [it] had been behaving according to a reasonable interpretation" of OPRA, and, even though the agency had behaved reasonably, OPRA nonetheless mandated attorneys' fees).
Here, the District Court and the Magistrate Judge incorrectly concluded that, because NJIT had acted reasonably in following the FBI's orders, it was absolved of any responsibility to pay attorneys' fees. This interpretation of reasonableness misreads Mason and conflicts with the plain language of OPRA. But even if Mason did impose the "reasonableness" requirement urged by NJIT, its conduct here was not reasonable. As discussed supra , NJIT-not the FBI-had the responsibility to parse the requested records, decide whether exemptions applied, and withhold documents pursuant to those exemptions. See N.J. Stat. Ann. § 47:1A-5(g). Instead, NJIT followed the FBI's orders to withhold thousands of pages of records. In doing so, it exposed itself to this litigation and the attorneys' fees that accompany it.[17]
IV.
The District Court erred in concluding that Golden and Locke were not prevailing plaintiffs entitled to attorneys' fees under OPRA.[18] A factual causal nexus exists between Golden and Locke's lawsuit and the release of records. We will therefore reverse the District Court's judgment and remand for the calculation of an appropriate fee award.

Golden's book was published by Henry Holt and Co. in October 2017. At the time of the events in this case, Locke was a publicist with Henry Holt and Co.

A "[g]overnment record" is broadly defined as "any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof." N.J. Stat. Ann. § 47:1A-1.1. "Government record" includes both records that an agency "made, maintained or kept on file in the course of ... its official business," and those that have "been received in the course of ... official business." Id.

The hours during which the records custodian must make records available are abbreviated for smaller public agencies. See id. § 47:1A-5(a).

Under OPRA, exemptions may be contained within OPRA itself, and also incorporated in resolutions of the New Jersey Legislature, Executive Orders, federal laws or regulations, or federal orders. Id. § 47:1A-5(a). Exemptions are construed narrowly. See id. § 47:1A-1 (declaring it to be the public policy of New Jersey that any limitations on the right of access accorded by OPRA "shall be construed in favor of the public's right of access").
If the records custodian deems part of a record to be exempt, she must delete or redact that portion and permit access to the remainder of the record. Id. § 47:1A-5(g). Before turning over responsive records, the records custodian also redacts certain personal information, including social security numbers, credit card numbers, and drivers' license numbers. Id. § 47:1A-5(a).

Certain records, including budgets, bills, vouchers, and contracts, are required to be provided immediately upon request. Id. § 47:1A-5(e). If a record is in storage or archived, the custodian must so notify the requestor within seven days and arrange to retrieve the record promptly. Id. §§ 47:1A-5(g), (i ).

NJIT's search failed to turn up any responsive records relating to the CIA.

Golden's common law right of access claim is not at issue in this appeal.

In early December 2015, following oral argument on the order to show cause, Judge Stephanie A. Mitterhoff ruled that the case was not yet ready for adjudication because the FBI needed additional time to review documents. Judge Mitterhoff ordered the FBI to start reviewing documents immediately.

Approximately 362 pages were duplicates.

"We review de novo whether the District Court had subject matter jurisdiction." In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila. , 790 F.3d 457, 465 (3d Cir. 2015).

See id. at 466 (instructing that the notice of removal "must allege the underlying facts supporting each of the requirements for removal jurisdiction").

The FBI also raises two other potential federal defenses-that portions of the disputed records are exempt from disclosure under the Privacy Act of 1974 and FOIA. We need not decide whether these defenses qualify as colorable federal defenses under § 1442(a)(1).

The FBI's status as a third-party defendant does not affect our conclusion that jurisdiction exists; third-party defendants may remove under § 1442(a)(1). See, e.g. , Johnson v. Showers , 747 F.2d 1228, 1229 (8th Cir. 1984) ("The fact that the Director is a third-party defendant does not defeat removal under section 1442(a)(1)."); IMFC Prof'l Servs. of Fla., Inc. v. Latin Am. Home Health, Inc. , 676 F.2d 152, 156 (5th Cir. 1982) (same).

We exercise plenary review over whether a party is a "prevailing party" under OPRA for purposes of attorneys' fee awards. See Addie v. Kjaer , 836 F.3d 251, 260 (3d Cir. 2016).

Although, as in this case, the requestor generally bears the burden of establishing the Mason factors, the burden shifts to the agency if it fails to respond to an OPRA request within seven days. Mason v. City of Hoboken , 196 N.J. 51, 951 A.2d 1017, 1032 (2008).

NJIT argues that the FBI was "the de facto custodian of records relative to plaintiffs' OPRA requests," Appellees' Br. 28, and that it had physical custody of and "absolute responsibility" for the records, id. at 32. These statements are irreconcilable both with the facts of this case and New Jersey law. Williams herself admitted that she is NJIT's custodian of records. NJIT, acting through Williams, also acted consistently with the role of records custodian: it located the records, printed the records, reviewed the records, asked the FBI to review the records, provided the FBI with physical copies of the records, produced the records after the FBI's review, and asserted OPRA exemptions as to the withheld records. Moreover, OPRA defines a records custodian as an "officer officially designated by formal action of [a public] agency's director or governing body"-a definition that does not include federal agencies such as the FBI. N.J. Stat. Ann. § 47:1A-1.1 ; see also id. (defining "[p]ublic agencies" within the meaning of OPRA).

The District Court's Order could be read to suggest that Golden and Locke should have filed a FOIA request to obtain the disputed records directly from the FBI. As NJIT readily admits, Golden and Locke had no obligation to proceed under FOIA. We therefore reject any argument that Golden and Locke were required to seek from another agency the government records within OPRA's purview.

Golden also contends that the District Court erred by failing to review de novo the Magistrate Judge's R&R. Because we are satisfied that the District Court conducted the required de novo review, we decline to reverse on this ground.